**Charles M. CONDON, Attorney General for the State of South Carolina, and The State of South Carolina, Plaintiffs,**

**v.**

**Janet RENO, Attorney General; United States of America, Defendants and Third Party Plaintiffs.**

**and**

**Trevor Potter, Chairman, Federal Election Commission; Federal Election Commission, Defendants,**

**State of South Carolina, Counter–Defendants,**

**Governor David Beasley, in his official capacity; William B. Depass, Jr., Chair of the State Election Commission, in his official capacity; and James F. Hendrix, Executive Director of the State Election Commission, in his official capacity, Third–Party Defendants.**

**GRASS ROOTS LEADERSHIP; Kamau Marcharia; South Carolina United Action; Ted Robinson; Natural Guard; Andrew Mitchell; and Sam Peterson, Plaintiffs,**

**v.**

**David BEASLEY, in his official capacity as Governor of the State of South Carolina; Charles M. Condon, in his official capacity as Attorney General of the State of South Carolina; William Depass, Deborah Cureton, Walter Robinson, Samuel Howell, and James Tanner, each in their official capacities as members of the South Carolina State Election Commission, Defendants.**

Civ. A. Nos. 3:95–192–0, 3:95–345–0.

United States District Court,
D. South Carolina,
Columbia Division.

Dec. 12, 1995.

Moffatt Laughlin McDonald, Atlanta, GA, Armand Georges Derfner, Charleston, SC, Maha Zaki, American Civil Liberties Union, Southern Regional Office, Atlanta, GA, for Grass Roots Leadership, Kamau Marcharia, South Carolina United Action, Ted Robinson, Natural Guard, Andrew Mitchell.

Armand Georges Derfner, Charleston, SC, for Samantha Peterson.

Charles Molony Condon, Attorney General of South Carolina, Columbia, SC, Treva G. Ashworth, Columbia, SC, Cameron B. Littlejohn, Jr., Assistant Attorney General, Columbia, SC, Kenneth Paul Woodington, Columbia, SC, for David Beasley, Charles M. Condon, William Depass, Deborah Cureton, Walter Robinson, Samuel Howell, James Tanner, State of South Carolina, James F. Hendrix.

John Douglas Barnett, Assistant United States Attorney, Columbia, SC, Janet Reno, U.S. Department of Justice, Civil Rights Division, Educational Opportunities Litigation, Washington, DC, Duval Patrick, Assistant U.S. Attorney General, Department of Justice, Washington, DC, John Tanner, Barry Weinberg, Gilda R. Williams, Voting Section, Civil Rights Division, Washington, DC, Holly Wiseman, Sarabeth Donovan, U.S. Dept. of Justice, Civil Rights Division, Voting Section, Washington, DC, for Janet Reno.

John Douglas Barnett, Assistant United States Attorney, John Tanner, Barry Weinberg, Gilda R. Williams, Voting Section, Civil Rights Division, Holly Wiseman, Sarabeth Donovan, U.S. Dept. of Justice, Civil Rights Division, Voting Section, Washington, DC, for U.S.

John Tanner, Barry Weinberg, Gilda R. Williams, Voting Section, Civil Rights Division, Holly Wiseman, Sarabeth Donovan, U.S. Dept. of Justice, Civil Rights Division, Voting Section, Washington, DC, for Trevor Potter, Federal Elections Commission.

John Douglas Barnett, Assistant United States Attorney, Barry Weinberg, Gilda R. Williams, Voting Section, Civil Rights Division, Holly Wiseman, Sarabeth Donovan, U.S. Dept. of Justice, Civil Rights Division, Voting Section, Washington, DC, for Danny L. McDonald.

PERRY, Senior District Judge.

## I. FINDING OF FACT

1. These are consolidated cases[1] in which the State of South Carolina and its officials seek to enjoin enforcement of the National Voter Registration Act, 42 U.S.C. § 1973gg et seq. (NVRA), while the United States and its officials, as well as private plaintiffs, seek to require South Carolina to comply with the National Voter Registration Act, 42 U.S.C. § 1973gg (Pub.L. No. 103–31, 107 Stat. 77) [NVRA]. The private action has been certified as a class action with plaintiff Samantha Peterson suing on behalf of all eligible but unregistered voters in the State of South Carolina. FED.R.CIV.P.RULE 23(b)(2); Tr. 205.

2. The State of South Carolina views the voter registration procedures set forth in the NVRA as a federal regulation imposed on and interfering with a state function. Properly viewed, however, the NVRA addresses a function which the Constitution has largely entrusted to the federal government—the

---

1. Fed.R.Civ.P. Rule 42(a). Tr. 11. References to the transcript of the February 21, 1995 proceedings are cited as "Tr." followed by the page number(s).

conduct of federal elections—and seeks to eliminate state interference with that function. In effect Congress has told the states, including South Carolina, that if they wish to adopt voter registration systems for federal elections, those systems must be designed to promote orderly elections and may not continue to act as barriers to voting. Congress has drawn on the lessons of many years and many states, presented at extensive hearings, to design the most efficient and least intrusive means of promoting voting without state interference. That means is simply to minimize "multiple registration requirements," i.e., to provide that when states record or register their citizens for one governmental purpose, such registration is also sufficient to register for voting in federal elections.

3. As described, Congress' goals are legitimate, its means are appropriate and limited, and the NVRA fully meets all constitutional requirements. The State of South Carolina will be ordered to submit a plan for full and prompt compliance.

### Background of NVRA

4. The National Voter Registration Act was passed in 1993 after repeated hearings over a period of several years. Congress' findings are reported in H.R.Rep. No. 103–9, 103rd Cong., 1st Sess. (1993), reprinted in 1993 U.S.Code Cong. & Admin.News 105 (the House Report), and S.Rep No. 103–6, 103rd Cong., 1st Sess. (1993) (the Senate Report). Those findings show that Congress was concerned that current registration requirements create two types of problems: low voter turnouts and unequal access to voting among different categories of citizens. Witnesses repeatedly told Congress that registration, rather than being simply a mechanism to facilitate orderly elections, was in fact a significant barrier to voting.[2]

5. Until the late 19th century, voting was largely restricted to white males, registration was generally unknown, and voter turnout rates were high. Congress found that the introduction of restrictive voter registration laws and procedures originated for the purpose of keeping certain groups of citizens from voting. Southern states, in particular, sought to bar blacks and certain of the rural poor from exercising the franchise. House Report at 2; Senate Report at 3.

6. Congress found that the institution of restrictive registration requirements immediately caused a steep drop in voting participation. In the southern states voter participation plummeted from 57% to 19% in the Presidential elections held between 1896 and 1924, with black voter participation falling to "essentially zero percent." House Report at 2. The registration section of South Carolina's 1892 election law is estimated to have disfranchised 75 percent of South Carolina's black voters.[3]

7. For many decades, the registration process has been the principle vehicle keeping voter participation down in the states of this Nation. As Congress found, even when the percentage of eligible voters registered was low, the percentage of registered voters who actually voted was consistently high. The House Report noted that "public opinion polls, along with individual testimony received by the Committee, indicate that failure to become registered is the primary reason given by eligible citizens for not voting. It is generally accepted that over 80 percent of those citizens who are registered vote in Presidential elections." House Report at 3 U.S.Code Cong. & Admin.News 1993 p. 107; see also, Senate Report at 2–3.

8. Evidence presented in this Court confirmed this fact for South Carolina. Thus, in 1990, only 52% of the eligible population was registered to vote, but 80% of those who were registered did actually vote in the 1992 Presidential election. Tr. 60 (Bowers); Tr. 95, 113 (Hendrix).

9. Congress has repeatedly attempted to deal with the problem of registering as a deterrent to voting. The First and Second Enforcement Acts, in 1870 and 1871, 16 Stat 140, made it a crime for state registration

---

2. Congress held at least six hearings between 1988 and 1993 solely in conjunction with the proposed voter registration reforms which would later be enacted in the form of the NVRA.

3. J. Morgan Kousser, The Shaping of Southern Politics: Suffrage Restrictions and the Establishment of the One party South, 1880–1910, p. 49 (New Haven: Yale University Press 1974).

officials to interfere with registration. The 1957 and 1960 Civil Rights Acts took further action focused on registration, and the 1964 Civil Rights Act provided that no one could be denied registration because of errors that were not material in determining eligibility. 42 U.S.C. § 1971(a)(2)(B). This was necessary to sweep away such tactics as disqualifying an applicant who failed to list the exact number of months and days in his age. The Voting Rights Act of 1965 temporarily suspended literacy tests in a group of states (later made a permanent ban and expanded to all states) and in extreme cases authorized the Attorney General to take the registration process out of state officials' hands and perform the registration process through federal officials.

10. Courts have likewise struggled with registration barriers. E.g., *Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939) (state adopted an early registration deadline to nullify Supreme Court decision which had held the grandfather clause unconstitutional); *Toney v. White*, 488 F.2d 310 (5th Cir.1973) (untimely purges); *Bishop v. Lomenzo*, 350 F.Supp. 576, 587 (E.D.N.Y. 1972) (premature registration cut-offs; the court rejected the state's claim that it was too burdensome to require faster processing of registration applications, saying "the remedy lies in providing more clerks rather than in registering fewer voters").

11. The foregoing statutes and cases did away with the most egregious obstacles to registration, but they still left most states with shamefully low levels of voting participation. Despite the much heralded increase in voter participation in the most recent Presidential election in 1992, 70 million eligible citizens still did not participate in the 1992 Presidential election because they were not registered to vote. Senate Report at 2. Thus, the House and Senate Reports related, even with an "enthusiastic electorate" of registered citizens, such as occurred in the 1992 Presidential election, the participation rate of American citizenry in the exercise of its most central democratic right was an "unimpressive" rate in the low 50's percentile. House Report at 3; Senate Report at 2.

12. South Carolina's participation in the 1992 (and 1988) Presidential elections ranked a dismal 49th in the Union, ever so slightly improving from its ranking of 50th in the 1984 Presidential election. Plaintiffs' Exhibits A–1, p. 2; A–2, p. 2; A–3, p. 2; A–4, p. 2.

13. Having thus found that low voter registration turnout in federal elections poses "potential serious problems in our democratic society," House Report at 4 U.S.Code Cong. & Admin.News 1993 at 107, Congress determined to pass the NVRA to remove as many obstacles to voting in federal elections as practicable. House Report at 3; Senate Report at 2.

14. In passing the NVRA, Congress acted to remove the obstructive aspects of registration, by making registration as convenient as receiving other services from government. This purpose is confirmed by the legislative reports, which found that "while Congress may not be able to directly affect voter turnout in Federal elections through the enactment of legislation, Congress does have the authority and responsibility to make the registration process for Federal elections as accessible as possible ..." House Report at 3 U.S.Code Cong. & Admin.News at 107.

15. Congress hoped that the result would be significantly increased registration and voting. National Voter Registration Act, Pub.L. 103–31 § 13. 107 Stat. 89 is codified at 42 U.S.C. § 1973gg. The statute (107 Stat. 89) provided that "this section takes effect with respect to a State that, on May 20, 1993, has a provision in the Constitution of the State that would preclude compliance with this subchapter, unless the State maintained separate Federal and State official lists of eligible voters, on the later of January 1, 1996, or the date that is 120 days after the date by which, under the Constitution of the State ... it would be legally possible to adopt and place into effect any amendments to the Constitution of the State that are necessary to permit compliance with this subchapter without requiring a special election, and with respect to a State not so described on January 1, 1995.

*THE NVRA*

The NVRA provides generally (42 U.S.C. § 1973gg–2) that

(a) In general

Except as provided in subsection (b) of this section, notwithstanding any other Federal or State law, in addition to any other method of voter registration provided for under State law, each state shall establish procedures to register to vote in elections for Federal office—

(1) by application made simultaneously with an application for a motor vehicle driver's license pursuant to section 1973gg–3 of this title;

(2) by mail application pursuant to section 1973gg–4 of this title; and

(3) by application in person—

(A) at the appropriate registration site designated with respect to the residence of the applicant in accordance with State law; and

(B) at a Federal, State, or nongovernmental office designated under section 1973gg–5 of this title.

(b) Nonapplicability to certain States

This subchapter does not apply to a State described in either or both of the following paragraphs:

(1) A State in which, under law that is in effect continuously on and after March 11, 1993, there is no voter registration requirement for any voter in the State with respect to an election for Federal office.

(2) A State in which, under law that is in effect continuously on and after March 11, 1993, or that was enacted on or prior to March 11, 1993, and by its terms is to come into effect upon the enactment of this subchapter, so long as that law remains in effect, all voters in the State may register to vote at the polling place at the time of voting in a general election for Federal office.

Other provisions of the NVRA are summarized as follows: [4]

(a) The NVRA requires each motor vehicle driver's license and renewal application to serve as an application for voter registration in federal elections. 42 U.S.C. § 1973gg–3(a)(1). Specifically, the NVRA requires each state to include a voter registration application form for federal elections "as a part of" the state driver's license application, 42 U.S.C. § 1973gg–3(b), and further provides that any change of address form submitted for driver's license purposes serve as notification of change of address for voter registration purposes. 42 U.S.C. § 1973gg–3(d).

(b) If a state chooses not to adopt a single form for the voter registration and driver's license application, the NVRA requires that a voter registration form be attached to or made a part of the driver's license application and require only the minimum amount of information necessary to prevent duplicate voter registration and enable state election officials to assess the eligibility of the applicant without repeating information already provided on the driver's license portion of the application. 42 U.S.C. § 1973gg–3(c)(1).

(c) The motor vehicles department is required by the NVRA to accept completed voter registration applications and deliver those applications to the appropriate state election officials not later that 10 days after acceptance or within 5 days if the application is submitted 5 days prior to the registration deadline. 42 U.S.C. § 1973gg–3(e). In addition, the NVRA requires states to ensure that all voter registration applications submitted 30 days prior to a federal election be administered in such a manner as to timely register eligible voting applicants. 42 U.S.C. § 1973gg–6(a)(1)(A).

(d) Congress decided to incorporate "motor voter provisions" into the NVRA because it found driver's license bureaus "to be ideally suited to the purpose of registering vot-

---

**4.** The Congress made specific findings at 42 U.S.C. § 1973gg that "[t]he right of citizens of the United States to vote is a fundamental right;" that "it is the duty of Federal, State, and local governments to promote the exercise of that right;" and that "discriminatory and unfair reg- istration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups...."

ers" and expanding opportunities for citizens to participate in federal elections. Senate Report at 5. Congress believed a "motor voter" program would be ideally suited because 85% to 90% of the voting age population nationwide maintains a driver's license or identification card issued by a state motor vehicle department and every state in the Union has existing procedures for properly identifying licensees with the "additional protection of a photograph." Senate Report at 5; *but see*, Plaintiffs' Exhibit B (detailing the percentage by race/ethnicity of households in South Carolina with vehicles available).

*Agency Registration Provisions*

(e) The designated agency provisions of the NVRA differentiate between two categories of agencies which are to serve as designated voter registration sites: mandated voter registration agencies and state designated voter registration agencies. 42 U.S.C. § 1973gg–5(a). Each such voter registration agency is required under the NVRA to (i) distribute mail registration forms, (ii) assist applicants in completing voter registration forms and (iii) accept voter application forms for transmittal to the appropriate state election officials, 42 U.S.C. § 1973gg–5(a)(4)(A), not later that 10 days after acceptance or within 5 days if the application is submitted immediately prior to the registration deadline. 42 U.S.C. § 1973gg–5(d).

(f) The NVRA mandates each state to provide voter registration opportunities in all offices that provide public assistance and in all offices that provide state-funded programs primarily for the disabled. 42 U.S.C. § 1973gg–5(a)(2). All such mandated agencies are required to distribute with each application for service or assistance (including renewals and change of address) not only the mail voter registration application described below, but also a standard form comporting with § 1973gg–5(a)(6)(B) of the NVRA and described below. Such mandated voter registration agencies are required to provide assistance to the voter registration applicant only to the "same degree" as customarily provided in completing the agency's "own forms". 42 U.S.C. § 1973gg–5(a)(6)(C).

(g) The NVRA requires mandated service and voter registration agencies to attach an additional form with the mail registration application. The additional form is required to set forth, among others things, the following: "(ii) if the agency provides public assistance, the statement, 'Applying to register or declining to register to vote will not affect the amount of assistance that you will be provided by this agency'"; and "(v) the statement, 'If you believe that someone has interfered with your right to register to vote, your right to privacy in deciding whether to register or in applying to register to vote, or your right to choose your own political party or other political preference, you may file a complaint with _____,' the blank being filled by the name, address, and telephone number of the appropriate official to whom such a complaint should be addressed." 42 U.S.C. § 1973gg–5(a)(6)(B).

(h) The NVRA requires each state to provide additional voter registration opportunities at such other offices as may be selected by the state. 42 U.S.C. § 1973gg–5(a)(3)(A). The NVRA enumerates the following agencies from which states may select several to serve as voter registration sites—public libraries, public schools, marriage license bureaus, fishing and hunting license bureaus, government revenue offices, unemployment offices and by agreement federal and nongovernmental offices. 42 U.S.C. § 1973gg–5(a)(3)(A).

(i) The Congressional intent underlying the NVRA's mandatory public assistance agency voter registration requirement was to provide "a useful supplement to motor-voter registration systems, enabling more low income and minority citizens to become registered, and [concluded it] is cost effective ... The agency based registration program is designed to reach out to those sectors of the population which are not likely to have driver's licenses or other identification cards issued by a motor vehicle agency." Senate Report at 14. In addition to reaching minority and low income Americans, Congress was concerned with reaching disabled Americans. "In order to access this isolated [disabled] population," Congress determined that it was "essential that as many locations as possible which provide services to disabled Americans

offer voter registration services." Senate Report at 16.

(j) Congress "strongly believe[d] that the mandatory [public service agency] portion [of the NVRA] provide[d] a necessary balance to the motor-voter portion, without unduly burdening State resources," House Report at 12 U.S.Code Cong. & Admin.News 1993 at 116, and that "[a]gency-based voter registration fulfill[ed] the requirement that government should do all it can to make registration widely and easily available." Senate Report at 14.

*Mail Registration*

(k) Pursuant to § 1973gg–7(a) of the NVRA, the Federal Election Commission (FEC), in conjunction with state election officials, promulgated a universal federal mail registration form. The NVRA requires that each state make such universal mail registration form (and, at the state's option, a state mail registration form as described below) available for distribution through governmental and private entities, with a particular emphasis on making mail registration forms available for organized voter registration drives. 42 U.S.C. §§ 1973gg–4(a) and 1973gg–4(b).

(*l*) A state is provided the flexibility to determine whether to develop and use its own mail registration form, in combination with the universal federal registration form. 42 U.S.C. §§ 1973gg–4(a)(2). If a state chooses to develop its own mail registration form, the NVRA requires the state mail registration form to include only such identifying information as is necessary to enable the state elections officials to assess the eligibility of the applicants, 42 U.S.C. § 1973gg–7(b)(1), and prohibits any notarization or other formal authentication requirement. 42 U.S.C. § 1973gg–7(b)(3).

(m) Finally, the NVRA requires states to ensure that all mail registration applications postmarked 30 days prior to a federal election be administered in such a manner as to timely register eligible voting applicants. 42 U.S.C. § 1973gg–6(a)(1)(B).

*Roll Maintenance; Fail–Safe Registration; and Other Provisions*

(n) In the administration of voter registration for federal elections, the NVRA requires each state to conduct certain general programs to maintain the integrity of the voter registration rolls while insuring that "once a citizen is registered to vote, he or she should remain on the voting list so long as he or she remains eligible to vote in that jurisdiction." 42 U.S.C. § 1973gg–6; Senate Report at 17.

(o) First, the NVRA requires appropriate state election officials to send notices to registration applicants of the disposition of their applications for registration. 42 U.S.C. § 1973gg–6(a)(2). The NVRA does not designate specific notification requirements to be employed by the states, "so that each state may continue to use whatever means is required or permitted ... [or] may adopt whatever procedure they deem best suited." House Report at 14 U.S.Code Cong. & Admin.News 1993 at 118; Senate Report at 30.

(p) The NVRA requires each state to "conduct a general program that makes a reasonable effort to remove the names of ineligible voters" from the official registration lists in the event of death or change of address. 42 U.S.C. § 1973gg–6(a)(4). The NVRA does not require the states to establish a particular program, but, as guidance to the states, provides that the states may meet the "requirement of conducting a general program that makes a reasonable effort to keep voting lists clean by using the National Change of Address ... Program of the U.S. Postal Service" described in 42 U.S.C. § 1973gg–6(c). House Report at 15 U.S.Code Cong. & Admin.News 1993 at 119; Senate Report at 30.

(q) The NVRA, however, prohibits the removal of names from the official voting rolls "by reason of the person's failure to vote," 42 U.S.C. § 1973gg–6(b)(2), or, unless certain of the following conditions are met, on the grounds that a registrant has changed address: (i) the receipt of a confirmation of change of address from the registrant, or (ii) no response from the registrant to the notice of removal from the voting rolls and nonvoting by the registrant for two general elec-

tions after the date of the disposition notice is mailed. 42 U.S.C. § 1973gg–6(d).

(r) Congress displayed particular concern to the intended and unintended consequences of removing eligible registered citizens from the official registration rolls. "While most States use the procedure of removal for non-voting merely as an inexpensive method for eliminating persons believed to have moved or died," Congress found that "[t]hese processes, however, must be scrutinized to prevent poor and illiterate voters from being caught in a purge system which will require them to needlessly re-register. Such processes must be structured to prevent abuse which has a disparate impact on minority communities. Unfortunately, there is a long history of such list cleaning mechanisms which have been used to violate the basic rights of citizens." Senate Report at 17–18.

(s) The NVRA further established certain procedural safeguards which permit registrants to vote in federal elections if (i) they have moved from one residence to another within the same polling place or the same congressional jurisdiction and (ii) they have previously failed to return the postage prepaid and pre-addressed return card enclosed with the notice of removal from the voting rolls. 42 U.S.C. § 1973gg–6(e).

(t) Finally, the NVRA requires states to maintain and make available for public inspection records regarding the implementation of voting registration procedures and roll maintenance, 42 U.S.C. § 1973gg–6(i), and to designate a state officer or employee as "the chief State election official responsible for coordination of State responsibilities" under the NVRA (including the responsibility of receiving notice of violations and curing violations of the NVRA). 42 U.S.C. §§ 1973gg–8 and 1973gg–9(b).

16. In the plain words of Congress—"It must be remembered that the purpose of our election process is not to test the fortitude and determination of the voter, but to discern the will of the majority." Senate Report at 3.

17. In accord with its legislative history, the NVRA asserts on its face that it was enacted for the purpose of increasing the number of eligible citizens who register to vote and participate in federal elections. 42 U.S.C. § 1973gg(b)(1) and (b)(2).

18. Moreover, the Congressional declaration of findings in the NVRA reaffirms the fundamental nature of the right of citizens to vote and specifically recounts the nexus between discriminatory registration laws and the damaging effect on voter participation in federal elections, with a disproportionate damaging impact on racial minorities. 42 U.S.C. § 1973gg(a)(1) and (a)(3).

19. The NVRA requires states that have chosen to require pre-election day voter registration as a condition to voting eligibility and continued to have such voter registration requirements in place on and after March 11, 1993, 42 U.S.C. § 1973gg–2(b), to facilitate voter registration. The NVRA does not apply to states that have no voter registration requirements or that permit voter registration at the polling place on election day, 42 U.S.C. § 1973gg–2(b), because Congress "believe[d] that states which have implemented one or both of these exceptions have lessened the impediments to registration [in a manner] which goes significantly beyond the requirements" of the NVRA.[5] House Report at 6 U.S.Code Cong. & Admin.News 1993 at 110; Senate Report at 23.

20. The NVRA requires states that have not yet "lessened the impediments to registration" to have established and have had in place by January 1, 1995 national voter registration procedures which provide enhanced voter registration opportunities to eligible citizens seeking to participate in federal elections. Specifically, the NVRA provides that

---

**5.** The House Report noted that "Maine, Minnesota and Wisconsin allow a form of 'same day' [voter] registration, and they rank among the top states in the percent of eligible voters registered.... The Committee concluded that while the concept of 'same day' registration might be desirable it would not be feasible to mandate such a procedure as a national standard until the number of unregistered citizens had been substantially reduced." House Report at 4 U.S.Code Cong. & Admin.News 1993 at 108. The participation of Maine, Minnesota and Wisconsin in the 1992 Presidential election ranked 1st, 2nd and 4th, respectively, as compared to South Carolina's 49th. Plaintiffs' Exhibit A–1, p. 2.

eligible citizens have access to mail-in voter registration applications and be able to register to vote in conjunction with applying for a driver's license and receiving services or assistance at enumerated Federal and state agencies and offices. 42 U.S.C. §§ 1973gg–3, 1973gg–4 and 1973gg–5.

### *South Carolina's Noncompliance with the NVRA*

21. South Carolina admits that it has not complied with the NVRA. Answer ¶ 22, p. 3.[6] South Carolina's witnesses agreed. Tr. 98, 99, 100 (Hendrix); Tr. 128 (Kuhns); Tr. 174–175, 189–192 (Maybank).

22. The main forms of non-compliance are the failure to afford voter registration simultaneously with a driver's license application and the failure to provide registration at various other public service offices. In addition, certain provisions of the South Carolina Code violate the NVRA, mainly S.C.Code § 7–3–20(C)(3) (which deletes eligible voters from the active rolls for failing to vote in each of two consecutive state-wide general elections), and S.C.Code § 7–5–155(a)(1) (which provides registration by mail but only 45 days before an election and only if the application is witnessed by another registered voter of the county).

23. In an effort to bring South Carolina into compliance with the NVRA, both houses of the South Carolina General Assembly passed House Bill 3385 entitled, in part, "AN ACT ... TO PROVIDE THAT THE GENERAL ASSEMBLY FINDS THAT CONGRESS HAS ENACTED THE 'NATIONAL REGISTRATION ACT OF 1993' (P.L. NO. 103–31 OF 1993) AND THAT THE PURPOSE OF THIS ACT IS TO COMPLY WITH THE PROVISIONS OF THAT CONGRESSIONAL LAW ..." House Bill 3385 amended the South Carolina Code provisions described above and, more importantly, allowed citizens to register to vote in conjunction with applying for a driver's license and receiving services or assistance at public agency offices. State's Exhibit 3. The Executive Director of the State Election Com-

mission testified that in his opinion, House Bill 3385 would have brought South Carolina into substantial compliance with the NVRA. Tr. 100–101.

24. South Carolina agencies made substantial efforts to prepare for compliance by the January 1, 1995 NVRA compliance deadline:

a. The Election Commission developed and printed an initial supply of conforming voter registration forms, contacted designated agencies and the Department of Motor Vehicles to coordinate necessary implementation procedures and completed plans for implementing the NVRA, except for the actual training of employees. Tr. 95–97 (Hendrix).

b. The Department of Social Services (which includes the Aid to Families with Dependant Children and the Food Stamps programs, among others), developed "all of the policies and procedures" including training materials, and contacted the county offices in preparation of NVRA's implementation. The only remaining uncompleted component necessary for full compliance with the NVRA was certain computer alterations. Tr. 127–128 (Kuhns).

c. Burnet Maybank, Acting Director of the Department of Revenue, testified that he was certain that some efforts were made at the DMV, but provided no specifics. Tr. 173 (Maybank).

25. After the effective date of the NVRA, then-Governor Carroll Campbell of South Carolina vetoed House Bill 3385.

26. At the same time, Governor Campbell issued Executive Order No. 95–03 directing the State Election Commission to promulgate a post-paid voter registration form, and to make the forms available for public distribution at the Department of Revenue (including its' Division of Motor Vehicles) and the Department of Health and Environmental Control (which administers the Women, Infants and Children program, commonly known as WIC). State's Exhibit 4, p. 2.

**6.** South Carolina's ANSWER OF ALL DEFENDANTS TO COMPLAINT AND AMENDED COMPLAINT filed on March 3, 1995 is hereinafter referred to as "Answer" followed by the paragraph number(s) and page number(s).

27. The Executive Order did not comport with the requirements of the NVRA. The Executive Order, among many other things, (i) did not provide for simultaneous voter registration in conjunction with the receipt of driver's licenses and mandated agency services as required by the NVRA; (ii) did not include the following agencies mandated by the NVRA as voter registration agencies—the Department of Social Services, the Department of Disabilities and Special Needs, the Commission for the Blind, the Department of Vocational Rehabilitation and the South Carolina Protection and Advocacy System for the Handicapped; (iii) did not designate any other offices or agencies as voter registration sites as required by the NVRA; and (iv) did not bring South Carolina's mail registration program into compliance with the NVRA. 42 U.S.C. §§ 1973gg–3, 1973gg–4 and 1973gg–5.

### South Carolina's Evidence

28. South Carolina sought to support its constitutional arguments with evidence intended to prove that the NVRA is both a costly burden on the State of South Carolina and unnecessary because registration is already easy enough in South Carolina. Although the Court holds that all such testimony is irrelevant to determining the constitutionality of the NVRA, the Court observes it is noteworthy that such evidence served to buttress Congressional findings and purposes underlying the NVRA rather than supporting South Carolina's contentions.

### South Carolina's Evidence of Cost.

29. Several of the witnesses testified about the costs of complying with the NVRA, but this testimony was unpersuasive for several reasons. First, it is apparent that each agency assumed that it would register (and thus bear the cost of registering) every un-registered voter in South Carolina, seemingly not once but on a recurring basis. Second, although South Carolina complains that it would be required to bear the entire cost of the NVRA, testimony indicated that many of the mandated voter registration agencies are heavily subsidized by the federal government. Plaintiffs' COMPLAINT, ¶ 32, p. 9; State's ANSWER ¶ 19, p. 3.

30. Each of the South Carolina department heads presenting testimony on behalf of the state initially testified that substantial recurring costs must be expended by South Carolina in order to comply with the NVRA. But upon cross examination, each of those officials admitted that their budgetary projections were based on untenable assumptions and "worst possible scenarios," i.e., universal suffrage in South Carolina. Tr. 115 (Hendrix).

31. Testimony about agency costs was presented by officials from the two agencies most likely to be registering voters, the Division of Motor Vehicle (DMV)[7] and the Department of Social Services (DSS).

a. The DSS Director estimated that the agency would have to spend $350,000 annually, largely for the provision of additional personnel. Tr. 125 (Kuhns); State's Exhibit 6. However, on cross-examination she conceded that this estimate was based on the assumption that every one of the 600,000 people who seek public assistance annually would be unregistered and would require registration every year—despite the existence of just 1,187,000 unregistered voters in the State of South Carolina. Tr. 139, 144 (Kuhns); State's Exhibit 6; Tr. 64 (Bowers). The DSS cost figures were largely based on estimates of the time required for registration assistance. Finally, the estimate failed to account for the substantial federal funds available to subsidize DSS in registering vot-

---

**7.** James Hendrix, the Executive Director of the State Election Commission, also testified about his agency's costs. But the costs of the State Election Commission—such as adding voters' records to the centralized computer files—are incurred by the mere fact that voters are being registered, without regard to how the registration occurs. In order words, these costs are not attributable to the NVRA except to the extent that more voters may register. Since South Carolina claims to agree that registering voters is a good idea, Tr. 16 (Woodington), the Court declines to consider these State Election Commission costs in measuring the "burden" that South Carolina fears. In any event, the Election Commission witness admitted that his cost estimate was inflated to meet what he called the "worst possible scenario"—surely a curious term to use in referring to increased voter participation. Tr. 90–91, 101–103, 115, 117 (Hendrix).

ers. Yet South Carolina's own exhibits showed that the federal government provides 50% of DSS's administrative costs, specifically including those incurred in connection with registering voters under the NVRA.[8] Tr. 125–126, 130 (Kuhns); State's Exhibits 6–A and 6–B. In fact, DSS is heavily subsidized by the federal government, which funds, for example, 100% of the food stamps benefits and 72% of the AFDC benefits. Tr. 131 (Kuhns). In fiscal year 1993–1994, the federal government paid $489,038,938 of DSS's budget, approximately four times greater than South Carolina's contribution. Plaintiffs' Exhibit C, p. 10.

b. The Acting Director of the Department of Revenue, Burnet Maybank, estimated a cost of more that $1,000,000 annually for the DMV. Tr. 165 (Maybank); State's Exhibit 7. However, this estimate was based on DMV alone (without DSS) registering 700,000 people more than the entire unregistered population of the State of South Carolina, and taking twice as much time as the DSS personnel to register each of those voters. State's Exhibits 6 and 7. On cross-examination, Maybank admitted that he did not know the basis for the DMV cost assumptions and projections Tr. 160–161, 176–177, 183–185 (Maybank), and that such agencies budget estimates can be based on "a good deal of discretion" and "can be" political. Tr. 180 (Maybank).

32. Finally, it should be noted that South Carolina did not even consider any potential savings in county registration offices. Private plaintiffs introduced documentation showing the voter registration budgets of 35 out of South Carolina's 46 counties, reflecting a total in those counties alone of well over $3,000,000 per year (which is substantially higher than the DSS and DMV cost estimates provided by South Carolina's witnesses). Plaintiffs' Exhibits D–1 through D–35. Of course cost is not the touchstone in this constitutional confrontation, but South Carolina's failure even to attempt to examine possible offsetting savings—or even possible net savings overall—seriously undermines South Carolina's claimed fiscal concerns about the NVRA.

South Carolina's Current Registration Provisions

33. South Carolina also presented evidence regarding the accessibility of the state's current registration procedures and programs. Although the Court holds that this evidence is irrelevant to the constitutional issues, it is significant that this evidence served to sustain Congressional findings and purposes underlying the NVRA and demonstrated South Carolina's non-compliance.

34. In examining the facts presented by South Carolina, several things must be kept in mind. First, whereas South Carolina may have adopted measures that are somewhat similar to the mechanisms that were chosen by Congress in enacting the NVRA, Congress envisioned a combination of remedies tied together to produce a whole. More important, the issue is not what registration methods this Court finds to be appropriate. Congress has already made that finding, and this Court's task is simply to see if the methods are constitutionally supportable.

35. Mail Registration. South Carolina principally relies on its system of mail registration adopted in 1986 to support its ease of registration contention. S.C.Code § 7–5–155(a)(1). This procedure permits an eligible citizen to register to vote by mail if the application is postmarked 45 days prior to an election date and if it has been witnessed by a registered voter.

36. In including mail registration as part of the NVRA, Congress was drawing on the lessons it learned from the 27 states that had already adopted mail registration. Senate Report at 12–13. And although South Carolina deserves credit for adopting mail registration, its procedure differs in critical respects and is in violation of the NVRA. In Congress' attempt to ease what it deemed to be unnecessary encumbrances to registration, the NVRA prohibited any notarization or other formal authentication requirement

---

**8.** This is in accordance with Congressional intent: "Costs for registration application assistance for these offices should be considered matchable under the current Federal match rate for these programs." Senate Report at 27–28; House Report at 11 U.S.Code Cong. & Admin.News 1993 at 115.

in mail voter registration applications. 42 U.S.C. § 1973gg–7(b)(3). Congress specifically barred a witness requirement, Senate Report at 36, as used in South Carolina. The NVRA further requires that mail registrants be allowed to vote 30 days after the application is postmarked, 42 U.S.C. § 1973gg–6(a)(1)(B), rather than waiting 45 days as South Carolina requires. S.C.Code § 7–5–155(a)(1). Finally, Congress found that simply adopting mail registration, without taking further steps, was likely to be ineffective. Therefore "[b]road dissemination of mail application forms, when coupled with the other procedures of this bill, should reach most person eligible to vote, and is, therefore, a key element of the voter outreach feature of the bill." House Report at 10 U.S.Code Cong. & Admin.News 1993 at 114.[9] South Carolina, by contrast, appears to have a "passive" system of distribution and outreach which sharply limits the reach of its program. Tr. 73, 73, 98 (Hendrix).

37. South Carolina's own evidence confirms the inherent ineffectiveness of its stand-alone mail registration program. State officials testified that since the implementation of the state registration by mail program in 1986, voter registration has "gone up some" (possibly precipitating the increase in South Carolina's national voter participation ranking from 50th in the Union to 49th in the Union),[10] but that overall voter participation in South Carolina had actually decreased between 1980 and 1990 despite the institution of the mail registration program. Tr. 61 (Bowers); Tr. 94 (Hendrix).

38. Limited Use of DMV Offices. To spur use of the mail registration procedure, the State Election Commission distributed the mail registration forms to DMV offices. However, this passive program falls far short of the "motor voter" program incorporated in the NVRA. Congress looked at state motor voter programs and saw that the most effective ones had observed as much as a fourfold increase in registration. Senate Report at 10; see also, Voter Registration: Hearing Before the House Subcommittee on Elections of the Committee on House Administration, 103rd Cong., 1st Sess., pgs. 4–10 (January 26, 1993) (Testimony of Washington Secretary of State, Ralph Munro).[11] The NVRA requirement that the driver's license application be a simultaneous voter registration application is at the heart of Congress' remedy, and it is this which is lacking in South Carolina.

39. The state official in charge of South Carolina's DMV testified that mail registration forms are "available in racks." Tr. 174 (MayBank). This is an explicit violation of the NVRA. 42 U.S.C. § 1973gg–3. Congress specifically addressed South Carolina's method and said that it falls short: "It would not be sufficient under the terms of this legislation for a State motor vehicles office merely to make a voter registration application available upon request to a license applicant or to simply put some forms on a table in the agency." Senate Report at 6.

40. The Court heard testimony which dramatically illustrated the sound judgment of Congress in requiring more than a mere display of mail registration applications at the DMV. On Friday before the trial in this case, the Acting Director of the Department of Revenue toured a number of his DMV offices, and could not recall seeing any mail registration forms in any of the DMV offices which he toured. Tr. 174 (Maybank). After testifying that DMV employees do not inform anyone about voter registration, Tr. 188 (Maybank), Maybank gave the following revealing answer when he was asked whether a

---

9. Congress also found that "[w]hile mail registration procedures make registration convenient, in communities where resources are limited, it has been demonstrated to be ineffective in registering those who have historically been left out of the registration process." Senate Report at 15.

10. Plaintiffs' Exhibits A–1, p. 2; A–2, p. 2; A–3, p. 2; A–4, p. 2.

11. The Washington Secretary of State, Ralph Munro, testified before the House Subcommittee on Elections in 1993 that "I am here today as a Republican Secretary of State to tell you that Motor Voter works … it is bringing citizens back to the voting booth in dramatic numbers…. On average, Motor Voter registered 875 people every working day of 1992…. In just nine months of operation, Motor Voter accounted for 58 percent of the total net increase in registrations from 1988 to 1992." (emphasis in original).

person who visits the DMV office would even see any mail registration forms:

A. They would definitely see the racks. "Now, you would have to go up and look at the rack to see what was in them." Tr. 187 (Maybank).

That is clearly not what Congress had in mind when it drafted the NVRA to include solutions that work.

41. Other Agencies. Perhaps the most damaging evidence offered by South Carolina was Executive Order 95–03, which the state presented to show its efforts to register voters. This Executive Order directed that voter registration mail applications should be provided in several state agencies, mainly the DMV and the Department of Heath and Environmental Control.[12] However, this narrow slice of agencies omitted social service agencies designated as mandatory sites in the NVRA (and included within House Bill 3385, the bill which had been vetoed by the Governor), including the Department of Social Services, the Department of Disabilities and Special Needs, the Commission for the Blind, the Department of Vocational Rehabilitation, and the Protection and Advocacy System for the Handicapped.

42. Selective assistance like this was one of Congress' major targets in passing the NVRA. Thus, Congress was concerned not only with increasing voter participation, but increasing it across the board, so that all segments of society would have equal opportunities. The NVRA's specific requirement to include public assistance agencies was regarded as "a necessary balance to the motor-voter portion," House Report at 12 U.S.Code Cong. & Admin.News 1993 at 116, "enabling more low income and minority citizens to become registered, ... [and was] designed to reach out to those sectors of the population which are not likely to have driver's licenses or other identification cards issued by a motor vehicle agency." Senate Report at 14. In addition to reaching minority and low income Americans, Congress was concerned with reaching disabled Americans. Senate Report at 16.

43. The evidence presented in this Court bears out Congress' concerns. The clients of the social service agencies are not only poor but minorities. Asked about the clientele of DSS, Ms. Kuhns testified that African–Americans make up approximately 80% of the clients in the AFDC Program, approximately 65–70% of clients in the Immediate Aid Program and approximately 65% of the clients in the Food Stamps Programs. Tr. 129–130 (Kuhns).

44. Moreover, poor and minority citizens are less likely to be served by the DMV. The Senate Report cited a Department of Transportation study finding that "almost 50 percent of those persons who do not have a driver's license have annual incomes of less than $10,000." Senate Report at 15. The Congressional finding that motor voter programs alone would not effectively reach minority and low income people is also confirmed by South Carolina's census figures, which show that more than 25% of African–Americans in South Carolina lack access to an automobile, compared to only 5% of whites in South Carolina. Plaintiffs' Exhibit B.

45. Congress specifically chose to mandate a comprehensive group of agencies as registration sites because, whereas any one of them might over-represent a part of the population, the combination would insure that all parts of the population were afforded the enhanced registration opportunities created by the NVRA. South Carolina's Executive Order ignores Congress' statutory scheme and opens the door to discrimination that Congress so carefully shut.

46. In sum, the Court finds that the South Carolina voter registration procedures violate the NVRA in material ways, and present significant obstacles to Congress' desire to achieve widespread and equitable voter registration. Therefore, there are no facts that will help South Carolina in its constitutional challenge to the NVRA. Instead the facts all tend to show that the NVRA is an appropriate and necessary solu-

---

**12.** Also included was the Department of Revenue, but apart from its Division of Motor Vehicles, which was separately listed in the Executive Order, the Department of Revenue does not appear to have citizens regularly coming to it for service or assistance.

tion to a problem that is well within Congress' power to deal with.

## CONCLUSIONS OF LAW

### Jurisdiction and Standing

1. The Court has federal question jurisdiction in both cases, 28 U.S.C. § 1331, and in the Grass Roots case the Court also has jurisdiction under 28 U.S.C. § 1343(a)(3) and (4).

2. The Court also has jurisdiction over the parties. In C.A. No. 3:95–192, the Condon case, the Court's jurisdiction over a suit by a state against the United States arises under 28 U.S.C. § 1346(a)(2). Likewise there is jurisdiction over the counterclaim by the United States against the State of South Carolina under 28 U.S.C. §§ 1345 and 1346(c).

3. If the private plaintiffs in C.A. No. 3:95–345, the Grass Roots case, were suing the state directly, they would be barred by the Eleventh Amendment as interpreted in *Hans v. Louisiana,* 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890), but since their suit is against state officials, and seeks only prospective injunctive relief rather than money damages, the Eleventh Amendment is not a bar. *Ex parte Young,* 209 U.S. 123, 28 S.Ct. 441, 52 L.Ed. 714 (1908), *United States v. Alabama,* 791 F.2d 1450 (11th Cir.1986).

4. There is no question of standing in the Condon case. In the Grass Roots case, one of the private plaintiffs, Samantha Peterson, testified that she is eligible to vote in federal elections in South Carolina except for the fact that she is not registered. She also testified that she moved to South Carolina in late December 1994, and received her driver's license at a Beaufort office of the DMV in January 1995. At that time no voter registration application or information was provided to her, which she alleged she was entitled to under the NVRA. Tr. 200–201. These facts are sufficient to constitute injury in fact which gives her standing to challenge South Carolina's actions under the NVRA. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

5. A section of the NVRA provides that an aggrieved person "may provide written notice of the violation to the chief election official of the State" and sue under the NVRA if no satisfactory answer is received in 90 days. 42 U.S.C. § 1973gg–9(b). Plaintiff Peterson did not provide written notice to South Carolina prior to filing suit, but this does not bar her suit, for two main reasons. First, this section is intended to give the state the opportunity to cure violations that are called to its attention, but here the State of South Carolina has made it plain that it refuses to comply, so the purpose of the section is fulfilled. Exhaustion of a remedy is not required when it would clearly be futile and South Carolina has admitted private plaintiffs' allegations of futility, as recited in paragraph 36(a)–(c) of Plaintiffs' COMPLAINT. ANSWER ¶ 22, 3. Second, the notice section is a prerequisite to filing a suit directly under the NVRA, but Section 1973gg–9(d) specifically provides that such rights and remedies established in the NVRA do not abrogate other rights, and here the private plaintiffs are also exercising their rights under 42 U.S.C. § 1983, and further grounding jurisdiction under 28 U.S.C. § 1343.

6. Plaintiff Peterson moved for class certification under FED.R.CIV.P. Rule 23(b)(2). The Court orally certified the class at the trial on February 21, 1995, Tr. 205, and now reiterates that Order. The case meets all the requirements necessary for class certification, and plaintiff Peterson is an adequate representative of the class. Class certification is important in this case to avoid mootness if plaintiff Peterson registers to vote while the suit is pending, and to allow representatives of the private plaintiff class to participate in and monitor the fashioning of effective relief.

### The Constitutional Issues

7. Justice Holmes wrote that when the Supreme Court is required to pass on the constitutionality of an Act of Congress, it is "the gravest and most delicate duty that this Court is called on to perform." *Blodgett v. Holden,* 275 U.S. 142, 148, 48 S.Ct. 105, 106, 72 L.Ed. 206 (1927). And, "[i]n no matter should [courts] pay more deference to the

opinion of Congress than in its choice of instrumentalities to perform a function that is within its power." *National Mutual Insurance Co. v. Tidewater Transfer Co.*, 337 U.S. 582, 603, 69 S.Ct. 1173, 1183, 93 L.Ed. 1556 (1949) (opinion of Jackson, J. quoted with approval in plurality opinion of Burger, C.J., in *Fullilove v. Klutznick*, 448 U.S. 448, 480, 100 S.Ct. 2758, 2775–76, 65 L.Ed.2d 902 (1980)).

8. In this case, Congress acted under both its power to regulate federal elections and its power to bar discrimination.

### Federal Elections

9. Article I, Section 4 of the Constitution of the United States gives Congress specific power to legislate regarding federal elections, and the federal authority is superior to the authority of the states whose regulations govern only in the absence of federal legislation. This Constitutional provision reads:

The Times, Place and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations ...

(Emphasis added.)

10. Article I, Section 4 refers only to congressional elections but has been applied to elections for President and Vice President, *Buckley v. Valeo*, 424 U.S. 1, 13, n. 16, 96 S.Ct. 612, 632, n. 16, 46 L.Ed.2d 659 (1976), and to primary elections. *United States v. Classic*, 313 U.S. 299, 61 S.Ct. 1031, 85 L.Ed. 1368 (1941).

11. Congress has additional power to regulate elections under Article I, Section 8, cl. 18, Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment of the Constitution of the United States.

12. More than a century ago, the Supreme Court recognized Congress' sweeping power over federal elections, even as it was narrowly construing other exercises of congressional authority. *Ex parte Siebold*, 100 U.S. 371, 25 L.Ed. 717 (1880); *Ex parte Yarbrough*, 110 U.S. 651, 4 S.Ct. 152, 28 L.Ed. 274 (1884). And, sixty years ago, in *Smiley v. Holm*, 285 U.S. 355, 366–67, 52 S.Ct. 397, 398–99, 76 L.Ed. 795 (1932), the Supreme Court settled all questions of the authority of Congress to regulate voter registration for federal elections:

The subject matter is the "times, places and manner of holding elections for Senators and Representatives." It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protecting of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved ... In exercising this power, the Congress may supplement state voting regulations or may substitute its own.

13. *Oregon v. Mitchell*, 400 U.S. 112, 91 S.Ct. 260, 27 L.Ed.2d 272 (1970), upheld the authority of Congress to fix the age of voters in national elections (while striking down the Congressional effort to set the voting age in state and local elections). That Congress may regulate the age of eligible voters in federal elections—despite the Constitutional grant of authority to states to regulate the qualifications of electors in Article I, Section 2—essentially forecloses any argument that it is not within Congress' authority to regulate voter registration in federal elections. The Supreme Court explained in *United States v. Classic, supra*, 313 U.S. at 315, 61 S.Ct. at 1037–38, why Congressional authority to regulate federal elections overrides the states' authority:

While in a loose sense, the right to vote for representatives in Congress is sometimes spoken of as a right derived from the states, this statement is true only in the sense that the states are authorized by the Constitution, to legislate on the subject as provided by § 2 of Art. I, to the extent that Congress has not restricted state action by the exercise of its powers to regulate elections under § 4 and its more general power under Article I, § 8, clause 18 of the Constitution "[t]o make all Laws

which shall be necessary and proper for carrying into Execution the foregoing Powers." [Citations omitted.]

*Fourteenth and Fifteenth Amendments*

14. In a series of cases the Supreme Court has recognized that Section 5 of the Fourteenth Amendment and Section 2 of the Fifteenth Amendment give Congress broad power to enact legislation to enforce the rights guaranteed by those amendments, specifically protections against racial discrimination in voting. *South Carolina v. Katzenbach,* 383 U.S. 301, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966); *Katzenbach v. Morgan,* 384 U.S. 641, 86 S.Ct. 1717, 16 L.Ed.2d 828 (1966); *Oregon v. Mitchell, supra; City of Rome v. United States,* 446 U.S. 156, 100 S.Ct. 1548, 64 L.Ed.2d 119 (1980).

15. Congress has broad authority to make fact findings and judgments as to the need for legislation, particularly under the Civil War Amendments. In 1970, Congress adopted a then temporary ban on the use of literacy tests as a prerequisite to voting nationwide. 42 U.S.C. § 1973aa, et seq. The Court, through five separate opinions, unanimously upheld the action as a proper exercise of Congress' authority under the Civil War Amendments. *Oregon v. Mitchell, supra,* 400 U.S. at 118, 91 S.Ct. at 261–62. Justice Stewart wrote

> Congress was not required to make state-by-state findings concerning either the equality of educational opportunity or actual impact of literacy requirements on the Negro citizen's access to the ballot box. In the interests of uniformity, Congress may paint with a much broader brush than may this Court ... The findings that Congress made when it enacted the Voting Rights Act of 1965 would have supported a nationwide ban on literacy tests.

400 U.S. at 284, 91 S.Ct. at 344.

■ 16. The authority of Congress to legislate granted by Section 5 of the Fourteenth Amendment has been equated with the broad powers expressed in the Necessary and Proper Clause, U.S. Const., Art. I, § 8, cl. 18. "Correctly viewed, § 5 is a positive grant of legislative power authorizing Congress to exercise its discretion in determining whether and what legislation is needed to secure the guarantees of the Fourteenth Amendment." *Katzenbach v. Morgan, supra,* 384 U.S. at 651, 86 S.Ct. at 1723–24. There is no requirement that the activity regulated or actions banned by Congress would actually violate the Equal Protection Clause. *Id.,* at 649, 86 S.Ct. at 1722–23.

■ 17. Whatever the balance of powers struck by the Constitution and the Tenth Amendment, the authority of Congress to legislate was increased by the Civil War Amendments. Congress has been given the unique constitutional power of legislating to enforce the provisions of the Fourteenth and Fifteenth Amendments. At an early date the Supreme Court stated that "[i]t is the power of Congress which has been enlarged" by the enforcement provisions of the Civil War Amendments. *Ex parte Virginia,* 100 U.S. 339, 345, 25 L.Ed. 676 (1880). "As against the reserved powers of the States, Congress may use any rational means to effectuate the constitutional prohibition of racial discrimination in voting." *South Carolina v. Katzenbach, supra,* 383 U.S. at 324, 86 S.Ct. at 816. In addition, where Congress has assessed and weighed conflicting factors in an area such as voting rights in which it has a specially informed legislative competence, it is not the duty of the Court "to review the congressional resolution of these factors. It is enough that we be able to perceive a basis upon which the Congress might resolve the conflict as it did." *Katzenbach v. Morgan, supra,* 384 U.S. at 653, 86 S.Ct. at 1724. There clearly is a basis upon which Congress could determine that remedial legislation was needed to facilitate voter registration and participation in federal elections.

18. The legislative history and the text of the NVRA are clear that Congress was utilizing its power to enforce the equal protection guarantees of the Fourteenth Amendment. The NVRA itself recites that "discriminatory and unfair registration laws and procedures can have a direct and damaging effect on voter participation in elections for Federal office and disproportionately harm voter participation by various groups, including racial

minorities." 42 U.S.C. § 1973gg(a)(3). The House Report states:

> Enactment of the Voting Rights Act of 1965 eliminated the more obvious impediments to registration, but left a complicated maze of local laws and procedures, in some cases as restrictive as the outlawed practices, through which eligible citizens had to navigate in order to exercise their right to vote. The unfinished business of registration reform is to reduce these obstacles to voting to the absolute minimum while maintaining the integrity of the electoral process.

H.Rep. No. 9, 103rd Cong., St.Sess. 3, reprinted in 1993 U.S.Code, Cong. & Admin.News, 105, 106–07. The Senate Report states:

> Throughout the history of this country there have been attempts to keep certain groups of citizens from registering to vote—which groups specifically depending on the decade and the locale. Among the techniques developed in the various localities to inhibit or exclude potential voters were annual registration, selective purging of the voter rolls, literacy tests and poll taxes. The Voting Rights Act of 1965 made most of these restrictive practices illegal, yet discriminatory and unfair practices still exist and deprive some citizens of their right to vote. This legislation will provide uniform national voter registration procedures for Federal elections and thereby further the procedural reform intended by the Voting Rights Act.

S.Rep. 6, 103rd Cong., St.Sess., 3.

19. The Supreme Court has uniformly found that the Civil War Amendments modified powers granted or reserved elsewhere in the Constitution. E.g., the doctrine of state sovereignty embodied in the Eleventh Amendment was of necessity limited by the enforcement provision of the Fourteenth Amendment. *Fitzpatrick v. Bitzer*, 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). The Fourteenth Amendment by its terms "contemplates interference with state authority." *Gregory v. Ashcroft*, 501 U.S. 452, 468, 111 S.Ct. 2395, 2405, 115 L.Ed.2d 410 (1991).

*Tenth Amendment*

20. South Carolina's sole claim and defense here is that the Act violates the Tenth Amendment of the Constitution of the United States. The Tenth Amendment provides as follows: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." The Tenth Amendment provides no protection for South Carolina because of the powers granted to Congress under the provisions of the Fourteenth and Fifteenth Amendments.

21. Because the Constitution specifically delegates to Congress the power to regulate federal elections and the NVRA is limited to federal elections, by its own terms the Tenth Amendment is inapplicable. Congress' power here is augmented by the authority granted under Article I, Section 8, clause 18, the "necessary and proper clause."

22. Likewise, Congress' powers under the Fourteenth Amendment are not limited by the Tenth Amendment. The Court in *Ex parte Virginia*, 100 U.S. 339, 346, 25 L.Ed. 676 (1880), stated:

> The prohibitions of the Fourteenth Amendment are directed to the states, and they are to a degree restrictions of State power. It is these which Congress is empowered to enforce and to enforce against state action, however put forth, whether that action be executive, legislative, or judicial.

23. South Carolina has previously argued unsuccessfully against an exercise of congressional power to guarantee equal voting rights. In *South Carolina v. Katzenbach, supra*, 383 U.S. at 323, 86 S.Ct. at 815–16, the Supreme Court upheld challenged sections of the Voting Rights Act of 1965 against the argument that it "encroach[ed] on an area reserved to the States by the Constitution." The Court also rejected arguments by South Carolina that various sections of the Act "violates the principle of the equality of States, denies due process by employing an invalid presumption ..., constitutes a forbidden bill of attainder, and impairs the separation of powers by adjudicating guilt through legislation." *Id.*

24. In *Hunter v. Underwood,* 471 U.S. 222, 233, 105 S.Ct. 1916, 1922–23, 85 L.Ed.2d 222 (1985), the Court rejected the argument that the Tenth Amendment trumped the Fourteenth Amendment. The Court found Alabama had intended to discriminate against blacks in adopting a constitutional provision barring persons convicted of certain crimes from voting. The state argued that the Tenth Amendment authorized it to deny the franchise to persons who committed crimes. While states could disenfranchise some persons convicted of crimes if it did so in a nondiscriminatory manner, the Court held "the Tenth Amendment cannot save legislation prohibited by the subsequently enacted Fourteenth Amendment." *Id.*

■ 25. Legislation under the enforcement clauses of the Fourteenth and Fifteenth Amendments is not subject to the Tenth Amendment constraints that are applicable to legislation adopted under other provisions of the constitution such as the Commerce Clause. *City of Rome v. United States, supra,* 446 U.S. at 179, 100 S.Ct. at 1562–63. The Civil War "Amendments were specifically designed as an expansion of federal power and an intrusion on state sovereignty." *Id.,* 179, 100 S.Ct. at 1563. Whatever the scope of the Tenth Amendment, where Congress acts pursuant to its powers under the Civil War Amendments, "principles of federalism that might otherwise be an obstacle to congressional authority are necessarily overridden by the power to enforce the Civil War Amendments by 'appropriate legislation.'" *Id.*

26. Congress may act under the Fourteenth Amendment in ways it could not act under other provisions of the Constitution. *Compare, National League of Cities v. Usery,* 426 U.S. 833, 852, n. 17, 96 S.Ct. 2465, 2474, n. 17, 49 L.Ed.2d 245 (1976) with *Fitzpatrick v. Bitzer,* 427 U.S. 445, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). *Usery* held that Congress exceeded its Commerce Clause powers in imposing wage and hour restrictions on states as to state and local employees. *Usery* was overruled in *Garcia v. San Antonio Metropolitan Transit Authority,* 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). But even *Usery* acknowledged that Congress might do under the Fourteenth Amendment what it could not do under the Commerce Clause. *Usery,* at 852, n. 17, 96 S.Ct. at 2474, n. 17. And four days after *Usery* was decided the Court in *Fitzpatrick v. Bitzer* upheld the 1972 amendments to the Civil Rights Act of 1964, which brought state and local governments under the fair employment provisions, under the authority granted by § 5 of the Fourteenth Amendment.

*Recent Tenth Amendment Cases.*

27. South Carolina relies upon *New York v. United States,* 505 U.S. 144, 163–67, 112 S.Ct. 2408, 2422–23, 120 L.Ed.2d 120 (1992), quoting South Carolinian Charles Coatesworth Pinckney as stating that the Constitutional Convention recognized "the necessity of having a government which should at once operate upon the people, and not upon the states ..." South Carolina Memorandum in Support of Motion for Preliminary Injunction, p. 9. *New York v. United States,* however, a case involving the Commerce Clause, did not address the Fourteenth Amendment. The Fourteenth Amendment specifically authorized Congress to legislate regarding state acts, and to enforce the protections of the Amendment and the prohibitions on the states from denying rights including the privileges and immunities of citizens of the United States and the equal protection of the laws.

28. South Carolina argues that Congress of necessity has compelled the state to adopt legislation to comply with the requirements of the Act. South Carolina then relies on *New York v. United States, supra,* as holding that Congress cannot compel states to enact legislation. The Act does not require states to adopt any legislation, though the state for its own purposes may do so. That South Carolina might find itself in the position of needing to change its laws is a result of its choice to have voter registration laws. Those states which have no voter registration laws, or which allow election day registration, were exempted from the Act. South Carolina's position is one which would swallow the NVRA. Under South Carolina's view, Congress, concerned that state laws and procedures were barriers to participation in federal elections would be prohibited from act-

ing to dismantle those barriers if the various states, in order to comply with the federal law, felt the need to enact legislation to repeal the barriers they erected.

29. South Carolina primarily relies on *New York v. United States,* a case in which the Supreme Court invalidated one provision of the Low Level Radioactive Waste Policy Amendments Act of 1985. That provision required states to either develop a regulatory scheme for the low level radioactive waste produced within their borders or to take title to such waste. The Court ruled the federal act exceeded Congressional powers under the Commerce Clause because it "commandeers the legislative process of the States by directly compelling them to enact and enforce a federal regulatory program." 505 U.S. at 176, 112 S.Ct. at 2428 quoting *Hodel v. Virginia Surface Mining & Reclamation Ass.,* 452 U.S. 264, 288, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981). South Carolina asserts that pursuant to *New York v. United States* Congress exceeded its authority in enacting the NVRA and violated the Tenth Amendment by "requiring the State government, the State legislature and executive agencies to administer a federal program ..." South Carolina COMPLAINT, p. 10, ¶ 22. Of necessity Congress, when it exercises its authority to regulate the "time, place and manner" of federal elections, elections which are conducted by state and local officials, requires state officials to adhere to federal laws. That in no way exceeds Congressional authority or violates the Tenth Amendment.

30. South Carolina contends that the NVRA violates the Tenth Amendment because it compels the state to expend its own funds, i.e., is an "unfunded mandate." No Supreme Court decision has applied the Tenth Amendment to invalidate congressional action on the ground that the action constituted an "unfunded federal mandate." E.g., *Federal Energy Regulatory Common v. Mississippi,* 456 U.S. 742, 770, n. 33, 102 S.Ct. 2126, 2143, n. 33, 72 L.Ed.2d 532 (1982) ("in a Tenth Amendment challenge to congressional activity, 'the determinative factor ... [is] the nature of the federal action, not the ultimate economic impact on the States.' *Hodel v. Virginia Surface Mining & Recl. Assn.,* 452

U.S. 264, 292, n. 33 [101 S.Ct. 2352, 2368, n. 33, 69 L.Ed.2d 1] (1981).").

31. *Hodel v. Virginia Surface Mining & Recl. Assn., supra,* 452 U.S. at 287, n. 28, 101 S.Ct. at 2366, n. 28 (1981) rejected a challenge to the Surface Mining and Reclamation Act under the Commerce Clause and the Fifth and Tenth Amendments. The Court, again explaining that Congressional power under the Fourteenth is even broader, stated:

> [b]ecause the [Fourteenth] Amendment was adopted with the specific purpose of limiting state autonomy, constitutional principles of federalism do not restrict congressional power to invade state autonomy when Congress legislates under § 5 of the Fourteenth Amendment. [*Fitzpatrick v. Bitzer, supra,* 427 U.S.] at 452–456 [96 S.Ct. at 2669–2671]. Similarly, in *City of Rome v. United States,* 446 U.S. 156, 179 [100 S.Ct. 1548, 1562–63, 64 L.Ed.2d 119] (1980), we held that the Tenth Amendment places no restrictions on congressional power "to enforce the Civil War Amendments 'by appropriate legislation.' "

Because *New York v. United States* relied extensively on *Hodel* and did not contradict this statement of the law, the argument of the State of South Carolina that *New York v. United States* somehow altered the relationship between the Tenth Amendment and the Civil War Amendments has no basis.

*The Means Used by Congress in the NVRA*

32. South Carolina recognizes that Congress has broad powers, but says the means chosen are nonetheless beyond those powers because Congress has conscripted state employees to perform a federal function. To the contrary, the Court concludes that Congress has acted in the least intrusive way to protect the integrity of federal elections. States already record and register their citizens to determine eligibility for certain state and federal programs and activities, including voting. Congress—addressing only the function of voting in a federal election—has merely forbidden the states from multiplying the burden on citizens. That is, Congress has determined that the information recorded by the states when citizens obtain drivers'

licenses, food stamps, and certain other governmental services, is enough to register those citizens for voting.

33. Eliminating wastefully duplicative processes is sound policy in general, but when that wasteful duplication deters people from voting, Congress has ample power and justification in not simply hoping for simplification but in mandating it. There is precedent in federal statutory and case law. In 1964, Congress enacted what is now 42 U.S.C. § 1971(a)(2)(B), forbidding states from denying registration for federal elections because of errors that were not material in determining eligibility to vote. In that Act, as here, Congress told the states how to gather information from citizens who were applying for registration, and barred the states from going further. Likewise, where states have imposed "dual registration requirements," forcing voters to register at a county office for some elections and to register again at a city office in order to vote in municipal elections, courts have struck these requirements down. *Mississippi State Chapter, Operation Push, Inc. v. Mabus*, 932 F.2d 400 (5th Cir.1991).

34. South Carolina's assertion that the NVRA compels it to appropriate funds and is thus "an unfunded mandate ... in violation of the Tenth Amendment," South Carolina COMPLAINT, p. 11, ¶ 24, is not supported by the facts in this case. The evidence showed that Congress has appropriated hundreds of millions of dollars to South Carolina to operate the very agencies involved under the NVRA, dollars which are permissibly used for administration of those agencies. It is well within the power of Congress to direct that some of the money it appropriates be spent on voter registration for federal elections.

■ 35. In testing whether an exercise of congressional power is constitutional, the findings that count are the "legislative facts" found by Congress. In upholding a limited ban on English literacy, the Court said as long as Congress reasonably could conclude that the legislation is warranted under the Fourteenth or Fifteenth Amendments, it is the province of Congress

to assess and weigh the various conflicting considerations—the risk or pervasiveness of the discrimination in governmental services, the effectiveness of eliminating the state restriction on the right to vote as a means of dealing with the evil, the adequacy or availability of alternative remedies, and the nature and significance of the state interests that would be affected by the nullification ...

*Katzenbach v. Morgan, supra*, 384 U.S. at 653, 86 S.Ct. at 1725.

■ 36. While in some limited circumstances, particularly criminal cases, litigants may challenge federal statutes with evidence that the legislative findings are irrational and wholly unfounded, this is not such a case. Even in writing criminal laws Congress may make presumptions, and "the congressional determination favoring the particular presumption must, of course, weigh heavily" and will be sustained if "the presumed fact is more likely than not to flow from the proved fact ..." *Leary v. United States*, 395 U.S. 6, 36, 89 S.Ct. 1532, 1548, 23 L.Ed.2d 57 (1969). However, given that Congress has express authority to regulate the manner of holding federal elections and to protect the exercise of the franchise from racial discrimination, the Act challenged is properly evaluated under the traditional standard of *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579, 605 (1819):

Let the end be legitimate, let it be within the scope of the constitution, and all means which are appropriate, which are plainly adapted to that end, which are not prohibited, but consist with the letter and spirit of the constitution, are constitutional.

■ 37. South Carolina complains that "the Act casts as outlaws State officials who are attempting to uphold the Constitution by refusing to implement the Act." South Carolina Memorandum in Support of Motion for Preliminary Injunction, p. 7. The Supreme Court in *Smiley v. Holm, supra*, 285 U.S. at 366, 52 S.Ct. at 399, stated that Congress could adopt any manner of regulations for federal elections and noted that "these requirements would be nugatory if they did not have appropriate sanctions in the definition of offenses and punishments." The argu-

ment that state officials' disagreement with Congress nullifies extending the franchise has no merit as a defense, and is reminiscent of the stance taken by the signers of the Southern Manifesto, introduced in Congress March 12, 1956, 102 Cong.Rec., No. 43, pp. 3948, 4004, "decry[ing] the Supreme Court's encroachments on rights reserved to the States and to the people" in its decision of *Brown v. Board of Education of Topeka, Kansas,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954).

38. Congress appropriately relied on the information gathered in adopting the Voting Rights Act and its amendments. In addition, the legislative history for the NVRA demonstrates the basis for the legislation. Congress identified a nationwide problem of low electoral participation and identified registration laws as a barrier to electoral participation. It also identified racial minorities and disabled persons as particularly disadvantaged by the operation of registration laws. Congress had a sound basis on which to conclude that a federal voter registration law was an appropriate means of furthering the protections of the Fourteenth and Fifteenth Amendments. It similarly had a sound basis to conclude, under its authority to regulate the time, place and manner of federal elections under Art. 1, Section 4 of the Constitution that "low voter turnout in Federal elections poses potential serious problems in our democratic society" and that Congress has "the responsibility to make the registration process for Federal elections as accessible as possible while maintaining the integrity of the electoral process." House Report at 4 U.S.Code Cong. & Admin.News 1993 at 107.

39. The same constitutional analysis applied to the Voting Rights Act of 1965 and its amendments apply to the NVRA. *South Carolina v. Katzenbach, supra; Katzenbach v. Morgan, supra; Oregon v. Mitchell, supra; City of Rome v. United States, supra.* The reach of the NVRA, registration for federal elections, is much narrower than the scope of the statutes upheld in these precedents. In enacting the National Voter Registration Act Congress acted within its authority, the ends are legitimate, and the means chosen are both appropriate and within the letter and spirit of the Constitution. The National Voter Registration Act is constitutional and does not violate the Tenth Amendment.

### JUDGMENT

For the reasons above stated, it is hereby ORDERED as follows:

(1) The motion of plaintiffs Charles M. Condon and the State of South Carolina for an injunction against enforcement of the National Voter Registration Act of 1993 (NVRA) is DENIED.

(2) The National Voter Registration Act of 1993 (NVRA) does not violate the Tenth Amendment. Because it is constitutional, it (the NVRA) is the supreme law of the land and therefore, is binding upon the State of South Carolina.

(3) The State of South Carolina is hereby permanently enjoined from refusing to comply with the provisions of the National Voter Registration Act of 1993.

(4) The State of South Carolina and its officials are ORDERED forthwith to implement the National Voter Registration Act and shall, within thirty (30) days from the date hereof file with the Court and serve all parties with the State's proposal for the full implementation of the Act.

A hearing on any objections by the United States, or the Grass Roots plaintiffs will be scheduled promptly thereafter.

IT IS SO ORDERED.