REVISED, June 30, 1999

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

_____

No. 98-30145

_____

ASSOCIATION OF COMMUNITY ORGANIZATIONS FOR REFORM NOW,

Plaintiff-Appellant,

v.

JERRY M FOWLER, in his official capacity as Commissioner of
Elections and Registration, State of Louisiana; MIKE FOSTER,
GOVERNOR, STATE OF LOUISIANA, in his official capacity as
Governor of the State of Louisiana; RICHARD STALDER, in his
capacity as Secretary of Department of Public Safety and
Corrections; MADELINE BAGNERIS, in her official capacity as
Secretary of the Department of Social Services; BOBBY JINDAL, in
his official capacity as Secretary of the Department of Health
and Hospitals,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Eastern District of Louisiana
_____

June 10, 1999

Before KING, Chief Judge, and POLITZ and BENAVIDES, Circuit
Judges.

KING, Chief Judge:

Plaintiff-appellant Association of Community

Organizations for Reform Now brought this suit in federal

district court against state officials alleging that Louisiana's

voter registration procedures violate the National Voter

Registration Act, 42 U.S.C. § 1973gg.  The district court granted

summary judgment to the state officials on standing grounds.  On

appeal, plaintiff-appellant argues that it has standing to bring each of its three claims as an organization and as a representative of its individual members. We conclude that plaintiff-appellant has raised a genuine issue of material fact as to whether it has standing to sue on its own behalf with respect to one of its claims, its contention that defendants-appellees have failed to make voter registration materials and services available at voter registration agencies. We affirm the district court's grant of summary judgment to defendants-appellees on all other grounds.

## I. FACTUAL AND PROCEDURAL BACKGROUND

This suit arises out of efforts by the Association of Community Organizations for Reform Now (ACORN) to force the State of Louisiana to comply with certain provisions of the National Voter Registration Act (the NVRA or Act), 42 U.S.C. § 1973gg. ACORN is a national, nonprofit, membership corporation that seeks to advance the interests of people with low and moderate incomes. According to affidavits from ACORN members, ACORN views its involvement in voter registration efforts as integral to the furtherance of this mission. According to these members, ACORN was involved in efforts to secure the passage of the NVRA, and also devotes resources to promoting voter registration by conducting voter registration drives, monitoring compliance with the NVRA, and participating in litigation aimed at enforcing the NVRA.

Congress enacted the NVRA in 1993

>     (1) to establish procedures that will increase the
>     number of eligible citizens who register to vote in
>     elections for Federal office;
>     (2) to make it possible for Federal, State, and local
>     governments to implement [national voter registration]
>     in a manner that enhances the participation of eligible
>     citizens as voters in elections for Federal office;
>     (3) to protect the integrity of the electoral process;
>     and
>     (4) to ensure that accurate and current voter
>     registration rolls are maintained.

42 U.S.C. § 1973gg(b). The NVRA requires all non-exempt states to establish certain procedures to facilitate voter registration. See id. § 1973gg-2. Specifically, states must (1) include a voter registration application form for federal elections as part of a state driver's license application, (2) accept voter registration application forms by mail, and (3) designate voter registration agencies, at which voter registration applications, and assistance and acceptance of applications, must be made available. See id. § 1973gg-3 to 1973gg-5.

In addition, the NVRA sets forth requirements with respect to the states' administration of the voter registration process. See id. § 1973gg-6. Under this provision, states must comply with a number of procedures designed to ensure a fair registration process. For example, in § 1973gg-6(d), the Act provides that states may not remove a registrant's name from voting rolls unless the registrant confirms in writing that he or she has moved outside the voting jurisdiction, or the registrant has failed to respond to a notice sent by the state and the registrant has not voted or appeared to vote within a specified time.

3

The NVRA took effect in Louisiana on January 1, 1995. Shortly after that date, ACORN sued certain Louisiana officials, alleging that Louisiana had refused to implement the Act.[1]  In the spring of 1995, the defendants in that suit settled with ACORN.

According to ACORN, Louisiana has continued to violate the NVRA despite the initial settlement.  First, ACORN claims that a Louisiana mail-in driver's license renewal program, which it alleges began in March 1995, violates the Act.  Under the program, certain residents with licenses nearing expiration receive renewal applications that can be completed and returned for a renewed license without an in-person application.  According to ACORN, Louisiana did not include voter registration applications with these mailings.  Second, ACORN asserts that some of the state's designated voter registration agencies are not complying with the NVRA's requirements.  ACORN bases this contention on statistics and surveys showing a low rate of registration in Louisiana and disparities in registration within Louisiana.  Third, ACORN claims that some previously-registered Louisiana voters believe that their names have been improperly removed from the voter registration rolls.

---

[1] ACORN also brought suit against at least two other states on the same basis.  See ACORN v. Miller, 129 F.3d 833 (6th Cir. 1997) (Michigan); ACORN v. Edgar, 56 F.3d 791 (7th Cir. 1995) (Illinois).

On June 10, 1996, ACORN reported these complaints to Louisiana in a notice-to-sue letter.[2]  Thereafter, ACORN provided additional information to Louisiana regarding the alleged NVRA violations, but, after failing to receive sufficient assurances that Louisiana would correct the problems, ACORN filed the instant suit under the NVRA, seeking declaratory and injunctive relief, as well as attorneys' fees and costs.[3]  ACORN's complaint alleged that the appellees violated the NVRA by (1) using a mail-in form for renewal of driver's licenses that does not allow for simultaneous voter registration, (2) improperly purging registered voters from voter records, and (3) failing to provide the required voter registration opportunities at certain public assistance offices, armed forces recruitment offices, and all offices in Louisiana that provide state-funded programs primarily engaged in providing services to persons with disabilities.

---

[2] In addition to allowing actions brought by the Attorney General, the NVRA creates a private right of action.  See 42 U.S.C. § 1973gg-9(b).  "A person who is aggrieved by a violation" of the Act may commence a civil action for declaratory or injunctive relief if the violation is not corrected within 90 days after receipt of notice of the violation, or within 20 days after receipt of notice if the violation occurred within 120 days before the date of a federal election.  Id. § 1973gg-9(b)(1)-(2).

[3] ACORN named as defendants in this suit Jerry M. Fowler, in his official capacity as Commissioner of Elections and Registration for the State of Louisiana, Mike Foster, in his official capacity as Governor, Richard Stalder, in his official capacity as Secretary of the Department of Public Safety and Corrections, Madeline Bagneris, in her official capacity as Secretary of the Department of Social Services, and Bobby Jindal, in his official capacity as Secretary of the Department of Health and Hospitals (collectively, the appellees).  This opinion refers to the appellees and the State of Louisiana interchangeably.

The parties commenced discovery, and on November 25, 1997, ACORN moved for partial summary judgment. The appellees opposed the summary judgment motion and moved to compel answers to interrogatories regarding details of ACORN's members. Subsequently, ACORN moved for a protective order. A magistrate judge resolved the discovery impasse by directing ACORN to provide identifying information about a limited number of its members who fell into discrete categories of members relevant to the suit. On January 7, 1998, the appellees moved for summary judgment on standing grounds.

The district court granted the appellees' motion for summary judgment on February 3, 1998 and dismissed each of ACORN's claims. The district court analyzed each of the grounds on which ACORN asserted it had standing to maintain suit. First, the district court concluded that ACORN could not sue on its own behalf. According to the district court, because ACORN does not vote and cannot register to vote, it could not qualify as a "person who is aggrieved" under the NVRA and thus lacked organizational standing as a matter of law. Second, the district court rejected ACORN's contention that it had standing as a representative of its individual members. The district court found that ACORN made no specific allegation that any of its members had been aggrieved by Louisiana's alleged failure to provide voting applications with mail-in driver's license renewals, or its failure to comply with the NVRA provision regarding registration at public assistance agencies. In sum,

the district court ruled that "the identified ACORN members simply have not suffered or continue to suffer sufficient 'threatened harm' for purposes of standing." Lastly, the district judge determined that ACORN, because it had no right as an organization to vote or register to vote, could not maintain standing to sue for the deprivation of a federal right under 42 U.S.C. § 1983. ACORN timely appealed.

## II.  DISCUSSION

We review the district court's grant of summary judgment on standing grounds de novo. See Palma v. Verex Assurance, Inc., 79 F.3d 1453, 1455-56 (5th Cir. 1996); Farm Credit Bank v. Farish, 32 F.3d 184, 189 (5th Cir. 1994). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986). We must view all evidence in the light most favorable to the party opposing the motion and draw all reasonable inferences in that party's favor. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

On appeal, ACORN asserts that the district court erred in ruling that ACORN failed to present a factual question as to whether it has standing to bring this suit as an organization and as a representative of its individual members. We first consider whether ACORN has standing to bring its claims on its own behalf.

7

## A. Organizational Standing

The inquiry as to whether a particular plaintiff has standing has two components, involving "both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise." Warth v. Seldin, 422 U.S. 490, 498 (1975); see City of Farmers Branch v. Pointer (In re Pointer), 952 F.2d 82, 85 (5th Cir. 1992). First, a plaintiff must show that he or she satisfies the constitutional standing requirements, which stem from the case or controversy requirement of Article III. See Friends of the Earth, Inc. v. Chevron Chem. Co., 129 F.3d 826, 827 (5th Cir. 1997). We then consider whether prudential standing concerns, which are a set of "judicially self-imposed limits on the exercise of federal jurisdiction" and can be modified or abrogated by Congress, apply. Bennett v. Spear, 520 U.S. 154, 162 (1997) (internal quotation marks omitted). We begin our analysis with the constitutional standing inquiry.

## 1. Article III Standing

An organization has standing to sue on its own behalf if it meets the same standing test that applies to individuals. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 378-79 (1982); National Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995). That standard, at its "'irreducible constitutional minimum,'" requires that the plaintiff demonstrate that he or she "has suffered 'injury in fact,' that the injury is 'fairly traceable' to the actions of the defendant, and that the

8

injury will likely be redressed by a favorable decision."
Bennett, 520 U.S. at 162 (quoting Lujan v. Defenders of Wildlife,
504 U.S. 555, 560-61 (1992)).

The Supreme Court applied these criteria in an
organizational standing context in Havens Realty. See 455 U.S.
at 378-79. In that case, Housing Opportunities Made Equal
(HOME), an organization operating a housing counseling service,
sued Havens Realty Corporation for allegedly engaging in racial
steering practices in violation of § 804 of the Fair Housing Act
of 1968, 42 U.S.C. § 3604. See id. at 366-67. HOME's complaint
alleged:

> Plaintiff HOME has been frustrated by defendants'
> racial steering practices in its efforts to assist
> equal access to housing through counseling and other
> referral services. Plaintiff HOME has had to devote
> significant resources to identify and counteract the
> defendant's [sic] racially discriminatory steering
> practices.

Id. at 379 (alteration in original). The district court granted
Havens Realty Corporation's motion to dismiss on standing
grounds. See id. at 369. The Fourth Circuit reversed, holding
that HOME's allegation of injury was sufficient, at the pleading
stage, to satisfy the standing requirements. See id. at 369-70.

The Supreme Court affirmed the Fourth Circuit's
determination that HOME had standing. See id. at 379. The Court
found HOME's allegations of injury, causation, and redressability
sufficient to establish organizational standing, stating:

> If, as broadly alleged, petitioners' steering practices
> have perceptibly impaired HOME's ability to provide
> counseling and referral services for low- and moderate-
> income homeseekers, there can be no question that the

9

> organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities--with the consequent drain on the organization's resources--constitutes far more than simply a setback to the organization's abstract social interests, see <u>Sierra Club</u> v. <u>Morton</u>, 405 U.S. [727,] 739 [(1972)]. We therefore conclude, as did the Court of Appeals, that in view of HOME's allegations of injury it was improper for the District Court to dismiss for lack of standing the claims of the organization in its own right.

<u>Id.</u> at 379 (footnotes omitted). With the <u>Havens Realty</u> analysis in mind, we turn our attention to whether ACORN has provided sufficient summary judgment evidence that it has suffered injury in fact, that its injury was caused by the alleged failure of Louisiana to implement the terms of the NVRA, and that its injury is likely to be redressed by a favorable verdict. <u>See</u> <u>Bennett</u>, 520 U.S. at 162.

Before we begin this analysis, however, we note the difference in procedural posture between the case at bar and <u>Havens Realty</u>; <u>Havens Realty</u> dealt with standing based on the pleadings, while in this case, the district court considered the appellees' summary judgment motion. At the pleading stage, "'general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presum[e] that general allegations embrace those specific facts that are necessary to support the claim.'" <u>Meadowbriar Home for Children, Inc. v. Gunn</u>, 81 F.3d 521, 529 (5th Cir. 1996) (quoting <u>Lujan</u>, 504 U.S. at 561) (alteration in original). "When the defendant moves for summary judgment because of lack of standing, however, the plaintiff must submit affidavits and comparable

10

evidence that indicate that a genuine issue of fact exists on the standing issue." Cramer v. Skinner, 931 F.2d 1020, 1025 (5th Cir. 1991). Therefore, to demonstrate standing, ACORN must point to specific summary judgment evidence showing that it was "directly affected" by Louisiana's alleged NVRA violations. Lujan, 504 U.S. at 563 (internal quotation marks omitted); see Fair Housing Council v. Montgomery Newspapers, 141 F.3d 71, 76 (3d Cir. 1998).

Supreme Court precedent teaches that the injury in fact requirement under Article III is qualitative, not quantitative, in nature. See Cramer, 931 F.2d at 1027; Saladin v. City of Milledgeville, 812 F.2d 687, 690 (11th Cir. 1987). Thus, an alleged injury must be "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical" to pass constitutional muster, Lujan, 504 U.S. at 560-61 (citations, footnote, and internal quotation marks omitted), but it need not measure more than an "identifiable trifle," United States v. Students Challenging Regulatory Agency Procedures (SCRAP), 412 U.S. 669, 689 n.14 (1973); see Save Our Community v. U.S. Environmental Protection Agency, 971 F.2d 1155, 1161 (5th Cir. 1992). In SCRAP, the Supreme Court expressly rejected the argument that the injury in fact requirement was limited to "significant[]" injuries, noting that it has upheld the standing of plaintiffs with "no more at stake in the outcome of an action than a fraction of a vote, a $5 fine and costs, and a $1.50 poll tax." 412 U.S. at 689 n.14 (citations omitted).

11

In the district court, ACORN supported its claim that it has suffered an injury sufficient to meet the Article III standing requirements by introducing two affidavits, one by Doug Hess[4] (the Hess affidavit) and one by Marianna Butler[5] (the Butler affidavit), and its responses to the appellees' interrogatories. ACORN's summary judgment evidence on this issue falls into three general categories: first, that it has expended resources litigating Louisiana's and other states' alleged failure to implement the NVRA; second, that it is involved in monitoring Louisiana's implementation of the NVRA; and third, that it has expended resources either registering voters or facilitating the registration of voters.

a. Litigation Costs

While any injuries ACORN may have suffered as a result of litigating Louisiana and other states' failure to comply with the NVRA might be concrete and particularized, they do not all suffice to establish standing. An organization cannot obtain standing to sue in its own right as a result of self-inflicted injuries, i.e., those that are not "fairly traceable to the actions of the defendant." Bennett, 520 U.S. at 162 (internal quotation marks omitted). Thus, it is immediately clear that ACORN's allegations of injury in fact due to resources it has

_____

[4] Doug Hess asserts in his affidavit that he was a political organizer for ACORN from 1994 to 1996, and that he was Project Director of ACORN's NVRA Implementation Project.

[5] Butler states in her affidavit that she serves as ACORN's Head Organizer in Louisiana, a position she has held for approximately 17 years.

12

expended bringing this and other NVRA-enforcement litigation fail to demonstrate ACORN's standing. See Fair Housing Council, 141 F.3d at 80 ("We hold, therefore, that the pursuit of litigation alone cannot constitute an injury sufficient to establish standing under Article III."); Association for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Ctr. Bd. of Trustees, 19 F.3d 241, 244 (5th Cir. 1994) ("The mere fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization."). Similarly, ACORN's summary judgment evidence that Hess, "in connection with this current lawsuit," has compiled statistical evidence regarding the implementation of the NVRA in Louisiana is insufficient to impart standing on ACORN to bring suit on its own behalf. See Association for Retarded Citizens, 19 F.3d at 244. Expanding the definition of Article III injury to include an organization's litigation-related expenses "implies that any sincere plaintiff could bootstrap standing by expending its resources in response to actions of another." Id.; see also Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) ("An organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit. Were the rule otherwise, any litigant could create injury in fact by bringing a case, and Article III would present no real limitation.").

b. Monitoring Costs

13

In addition, ACORN's summary judgment evidence that it has expended resources monitoring Louisiana's implementation of the NVRA is insufficient to raise a genuine issue of material fact on the standing issue. ACORN's summary judgment evidence on this issue consists of the following: (1) that it "has performed studies of voter registration and implementation of the National Voter Registration Act, on its own, and in conjunction with other organizations. These studies include reviews of Louisiana," (2) that Hess, the Project Director of ACORN's NVRA Implementation Project, attended an "NVRA implementation conference" in late 1994, (3) that Hess conducted "research includ[ing] work aimed at persuading states to pass legislation and implement procedures which would most effectively carry out the mandates of the NVRA," and (4) that Hess recalls "filing at least one letter of objection with the Department of Justice on proposed legislation submitted pursuant to the Voting Rights Act which [he] believed did not meet" NVRA requirements.

The problem with ACORN's allegation that it has suffered a sufficient injury in fact due to its allocation of resources to these activities is that ACORN has made no showing that these monitoring costs are fairly traceable to any of the conduct by Louisiana that ACORN claims in its complaint is illegal. See Fair Housing Council, 141 F.3d at 78 & n.5. In Fair Housing Council, the Third Circuit considered a similar claim under the Fair Housing Act in which an organization claimed to have standing to sue on its own behalf because it had spent money

14

reviewing classified ads on an ongoing basis for evidence of discrimination.  See id.  The court held that the organization's allocation of resources to reviewing ads was insufficient to confer standing in light of the organization's failure to show that it would not have undertaken the same efforts in the absence of the alleged illegal act by the defendants.  See id.  In this case, ACORN has failed to show that any of its purported injuries relating to monitoring costs were in any way caused by any action by Louisiana that ACORN now claims is illegal, as opposed to part of the normal, day-to-day operations of the group.  These general allegations of activities related to monitoring the implementation of the NVRA fail to confer standing on ACORN to bring this lawsuit on its own behalf.

c.  Voter Registration Costs

According to ACORN's third category of summary judgment evidence, ACORN engages in significant voter registration activities.  In particular, the affidavits, interrogatory responses, and studies concerning the implementation of the NVRA presented by ACORN to the district court indicate that ACORN engages in voter registration drives in Louisiana, that it provides voter registration applications to unregistered potential members, and that it makes voter registration applications available at housing fairs that it attends throughout the year.  In addition, according to the Hess affidavit, Hess hired staff to train ACORN members on how to conduct voter registration drives and to research voter

15

registration rates, coordinated voter registration drives at "various" ACORN offices, supervised ACORN field staff as they recruited volunteers and ran a voter registration drive, maintained reports received from "some of the larger" ACORN offices regarding the number of people registered through its voter registration drives, and "did presentations to the organizations" on how to conduct effective voter registration drives.

ACORN claims on appeal, as it did before the district court, that its efforts registering voters in Louisiana counteract the appellees' failure to properly implement the NVRA. Under Havens Realty, an organization has standing to sue on its own behalf where it devotes resources to counteract a defendant's allegedly unlawful practices. See 455 U.S. at 379; Spann, 899 F.2d at 28; Cleburne Living Ctr., Inc. v. City of Cleburne, 726 F.2d 191, 202-03 (5th Cir. 1984), affirmed in part and vacated in part on other grounds, 473 U.S. 432 (1985). In Cleburne Living Center, we considered whether an association that promoted the general welfare of the mentally disabled had standing to challenge the validity of a zoning ordinance that excluded certain forms of group homes from an apartment house district. See 726 F.2d at 202-03. We determined that the association lacked standing because it failed to prove a drain on its resources resulting from the defendant's action. See id. However, we noted that the association would have had standing to sue if it had proved (1) that it provided counseling services to the mentally disabled

16

affected by the defendant's act, and (2) that it had to devote resources to combating the defendant's alleged discrimination. See id. at 203. Thus, we concluded that the association would have been entitled to sue on its own behalf had it proven a "drain on its resources" resulting from counteracting the effects of the purportedly illegal zoning ordinance. Id.

Much of ACORN's summary judgment evidence regarding its laudable work registering voters, however, suffers from the same malady as its evidence regarding monitoring costs. ACORN has not made a sufficient showing that it engaged in any of the activities mentioned in the Hess affidavit as a direct result of Louisiana's alleged failure to properly implement the NVRA. Indeed, none of the evidence presented in the Hess affidavit is even Louisiana-specific. We therefore conclude that the Hess affidavit fails to raise a genuine issue of material fact that ACORN has expended any resources registering voters that are fairly traceable to any particular action by the appellees. See Bennett, 520 U.S. at 162.

In addition, we have grave doubts that ACORN's allegations of injury due to including voter registration applications with its membership applications or "set[ting] up" a voter registration table at housing fairs that it already attends suffice to confer standing on ACORN to sue on its own behalf. We fail to see any concrete or identifiable resources that ACORN could reallocate to other uses, if Louisiana were to properly implement the NVRA, that it now spends engaging in these

17

activities.  We conclude that ACORN's evidence concerning these activities raises no genuine issue of material fact that ACORN has been "perceptibly impaired" by the appellees' purported failure to implement the NVRA.  Havens Realty, 455 U.S. at 379 (stating that organization alleged sufficient injury where defendant's actions had "perceptibly impaired" organization); see SCRAP, 412 U.S. at 688-89 (stating that plaintiff must show that he or she "has been or will in fact be perceptibly harmed" by defendant's action to confer standing); see also Cramer, 931 F.2d at 1026-27 (stating that "speculative and hypothetical" injury is insufficient to confer standing on plaintiff).

Nevertheless, we conclude that ACORN has standing at this stage of the litigation to raise one of the claims it brought before the district court.  After carefully reviewing ACORN's summary judgment evidence, we are convinced that ACORN has raised a genuine issue of material fact that it has expended definite resources counteracting the effects of Louisiana's alleged failure to implement 42 U.S.C. § 1973gg-5(a)(4)(A), which requires states to facilitate voter registration at voter registration agencies, including public aid offices.  According to its summary judgment evidence, ACORN conducts at least one voter registration drive a year in Louisiana, and its registration drives focus on registering people at "welfare waiting rooms, unemployment offices, and on Food Stamp lines." In particular, ACORN alleges that it conducted one such voter registration drive in late 1995 through early 1996 that

18

registered approximately 400 new voters in New Orleans, Lafayette, and Lake Charles, Louisiana.  Significantly, ACORN presents evidence that it concentrated this voter registration campaign in areas where the percentages of all food stamp participant households registered to vote, a population directly affected by one of the NVRA requirements that ACORN claims Louisiana has failed to implement,[6] are among the lowest in Louisiana.

This summary judgment evidence is sufficient to raise a genuine issue of material fact that ACORN has expended resources counteracting one of the areas in which ACORN alleges that the appellees fail to implement the NVRA.  Simply put, ACORN has presented evidence that it has expended resources registering voters in low registration areas who would have already been registered if the appellees had complied with the requirement under the NVRA that Louisiana must make voter registration material available at public aid offices.  Thus, a portion of the resources ACORN has spent and currently spends on voter registration drives counteracts Louisiana's alleged failure to

---

[6] As discussed <u>supra</u>, the NVRA requires states to designate as voter registration agencies "all offices in the State that provide public assistance" and "all offices in the State that provide State-funded programs primarily engaged in providing services to persons with disabilities."  42 U.S.C. § 1973gg-5(a)(2).  The Act mandates that states make the following services available at all voter registration agencies:  (1) distribution of mail voter registration application forms, (2) assistance in completing voter registration application forms, and (3) acceptance of completed voter registration application forms.  <u>See</u> <u>id.</u> § 1973gg-5(a)(4)(A).  ACORN's third claim in its complaint alleges that Louisiana has failed to implement this provision.

19

implement the Act.  It is these wasted resources, which ACORN could have put to use registering voters that the NVRA, even properly implemented, would not have reached (or which ACORN could have put toward any other use it wished), that provide ACORN with standing to pursue its third claim in its complaint, that Louisiana has failed to comply with 42 U.S.C. § 1973gg-5(a)(4)(A), on its own behalf.

We note that the D.C. Circuit, in <u>National Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996), stated that, in addition to an allegation that "a defendant's conduct has made the organization's <u>activities</u> more difficult, the presence of a direct conflict between the defendant's conduct and the organization's <u>mission</u> is necessary-- though not alone sufficient--to establish standing."  The court noted in that case that unless it was clear that an organization's stated goals were "at loggerheads" with a defendant's conduct, "it is entirely speculative whether the defendant's conduct is impeding the organization's activities." <u>Id.</u> (internal quotation marks omitted).  ACORN has met this burden.  Its purpose, according to its summary judgment evidence, is to increase the political power of low- and moderate-income people in the political process.  We have no trouble concluding that ACORN has raised a genuine issue of material fact that this purpose is in direct conflict with Louisiana's alleged failure to

facilitate voter registration in voter registration agencies.[7] Therefore, based on ACORN's summary judgment evidence outlining its expenditure of resources counteracting the effects of the appellees' alleged failure to implement § 1973gg-5(a)(4)(A), we conclude that ACORN has met the constitutional standing requirements for purposes of defeating the appellees' summary judgment motion with respect to its claim that Louisiana has failed to provide voter registration materials in public aid offices.

However, the summary judgment evidence that ACORN has presented regarding its efforts registering voters does not raise a genuine issue of material fact that it has standing to pursue its other claims on its own behalf. In addition to its claim that Louisiana has failed to make voter registration materials available at public aid offices, ACORN also alleges that Louisiana has failed to implement the NVRA by refusing to include voter registration materials with its mail-in driver's license renewal applications, in violation of 42 U.S.C. § 1973gg-3, and by improperly purging voters from its voter rolls, in violation of 42 U.S.C. § 1973gg-6. While we can reasonably infer from ACORN's summary judgment evidence that it has spent resources

---

[7] Of course, a showing that an organization's mission is in direct conflict with a defendant's conduct is insufficient, in and of itself, to confer standing on the organization to sue on its own behalf. See Havens Realty, 455 U.S. at 379 (citing Sierra Club, 405 U.S. at 739). As we have made clear, an organization must also show that it has suffered a concrete and demonstrable, and redressable, injury as a direct result of the defendant's allegedly illegal conduct.

21

registering voters that would have been registered had Louisiana made registration material available at public aid offices, as we discussed supra, ACORN has included no evidence in the record allowing us to make such an inference with respect to these two claims.

ACORN and its amici allege in their briefs that the mere fact that ACORN has spent, and continues to spend, resources registering voters in Louisiana is sufficient to create a genuine issue of material fact that it has spent discrete resources counteracting the effects of Louisiana's alleged failure to comply with § 1973gg-3 and § 1973gg-6. We disagree. There is simply no suggestion in the record that anyone it has registered through its voter registration drives would already have been registered to vote if Louisiana implemented the NVRA requirements that form the basis of its first two claims. While ACORN is "entitled to have reasonable inferences drawn in [its] favor, the inferences to be drawn must be rational and reasonable, not idle, speculative, or conjectural." Unida v. Levi Strauss & Co., 986 F.2d 970, 980 (5th Cir. 1993) (internal quotation marks omitted); see Engstrom v. First Nat'l Bank, 47 F.3d 1459, 1462 (5th Cir. 1995). To infer that ACORN has spent resources combating Louisiana's alleged failure to provide voter registration forms with mail-in driver's license applications and to properly maintain its voter rolls simply from evidence that ACORN conducts at least one voter registration drive a year in Louisiana is, in

our view, speculative.  Thus, we must conclude that ACORN, as an organization, lacks standing to pursue these two claims.

In sum, we hold that ACORN's summary judgment evidence is sufficient to raise a factual question as to whether it has suffered a concrete and demonstrable injury with respect to its claim that Louisiana refuses to make voter registration materials available in public aid offices.  However, the record is devoid of any evidence from which we can reasonably infer that ACORN has suffered an actual injury directly resulting from its claims that Louisiana has violated § 1973gg-3 or § 1973gg-6.  Thus, we conclude that ACORN has made a sufficient showing of Article III standing to defeat the appellees' summary judgment motion with respect to its third claim in its complaint, but not with respect to its other two claims.

We therefore proceed to consider first whether ACORN can hurdle any prudential standing requirements imposed by the NVRA with respect to its third claim, and, thereafter, we will consider whether ACORN has standing to bring its first two claims as a representative of its individual members.

## 2.  Prudential Standing

"In addition to the immutable requirements of Article III, the federal judiciary has also adhered to a set of prudential principles that bear on the question of standing."  Bennett, 520 U.S. at 162 (internal quotation marks omitted); see Cramer, 931 F.2d at 1024.  These judicially created limits concern whether a plaintiff's grievance arguably falls within the zone of interests

23

protected by the statutory provision invoked in the suit, whether the complaint raises abstract questions or a generalized grievance more properly addressed by the legislative branch, and whether the plaintiff is asserting his or her own legal rights and interests rather than the legal rights and interests of third parties.  See Cramer, 931 F.2d at 1024-25.

Unlike the constitutional standing requirements, which we discussed above, Congress can modify or even abrogate prudential standing requirements, thus extending standing to the full extent permitted by Article III.  See Bennett, 520 U.S. at 162; In re Pointer, 952 F.2d at 85.  We therefore look to the Act to determine whether Congress intended the prudential standing doctrine to apply to suits brought under the NVRA.  See Bennett, 520 U.S. at 163 ("Congress legislates against the background of our prudential standing doctrine, which applies unless it is expressly negated."); Friends of the Boundary Waters Wilderness v. Dombeck, 164 F.3d 1115, 1125 (8th Cir. 1999) ("The breadth of this zone-of-interests test varies depending upon the language of the statutory provision at issue.").

Under the NVRA, "[a] person who is aggrieved by a violation" of the Act "may provide written notice of the violation to the chief election official of the State involved."  42 U.S.C. § 1973gg-9(b)(1).  If the violation is not corrected within a specific time period, "the aggrieved person may bring a civil action in an appropriate district court for declaratory or injunctive relief with respect to the violation."  Id. § 1973gg-

24

9(b)(2). The court may also award "reasonable attorney fees, including litigation expenses, and costs" to a prevailing party other than the United States. Id. § 1973gg-9(c).

ACORN argues that Congress's use of the term "aggrieved person" in NVRA's private right of action evidences an intent by Congress to expand standing under the Act to Article III limits. The district court disagreed, noting that the Act defines neither person nor aggrieved, and concluding that because ACORN does not vote and cannot register to vote, it cannot, as a matter of law, be an aggrieved person under the NVRA.

We conclude that although Congress did not explicitly define what it meant by an aggrieved person under the NVRA, it intended to extend standing under the Act to the maximum allowable under the Constitution. We concede that Congress's use of the term aggrieved person to eliminate prudential standing requirements under the NVRA is not as clear as under Section 810(a) of the Civil Rights Act of 1982 (Title VIII), in which it explicitly defined an "aggrieved person" as "any person who [] claims to have been injured . . . or who believes that such person will be injured." 42 U.S.C. § 3602(i). In Trafficante v. Metropolitian Life Insurance Co., 409 U.S. 205 (1972), the Supreme Court interpreted Congress's use of person aggrieved in that statute to have evidenced "a congressional intention to define standing as broadly as permitted by Article III of the Constitution." Id. at 209 (internal quotation marks omitted).

25

However, as the Supreme Court recently observed in <u>Federal Election Commission v. Akins</u>, 118 S. Ct. 1777, 1783 (1998), in which the Court specifically discussed Congress's use of the undefined term "party aggrieved" in the Federal Election Campaign Act, "[h]istory associates the word aggrieved with a congressional intent to cast the standing net broadly--beyond the common-law interests and substantive statutory rights upon which prudential standing traditionally rested."[8] <u>Id.</u> (internal quotation marks omitted). Furthermore, several circuit courts have interpreted the term "person aggrieved," an almost identical term to that used in the NVRA, to have eliminated prudential standing requirements in the context of other federal laws, thus allowing any plaintiff meeting Article III standing requirements to sue under the law. <u>See</u> <u>Bloom v. NLRB</u>, 153 F.3d 844, 849 (8th Cir. 1998) (concluding that "Congress intended to cast the standing net broadly . . . by authorizing '[a]ny person aggrieved' to seek review of an order by the Board under section 10(f) of the [National Labor Relations] Act"), <u>cert. granted and vacated on other grounds</u>, 119 S. Ct. 1023 (1999); <u>Ozonoff v. Berzak</u>, 744 F.2d 224, 228 (1st Cir. 1984) (Breyer, J.) ("[P]rudential requirements are typically excused only in unusual circumstances, such as where Congress has enacted a special 'person aggrieved' statute, allowing a plaintiff to act as a 'private attorney general.'").

---

[8] We note that the district court did not have the benefit of <u>Akins</u> when it ruled on the appellees' summary judgment motion.

26

In addition, we are unconvinced by the appellees' argument that the word "person" before "aggrieved" in the NVRA evidences an intent by Congress to limit standing to individuals, as opposed to corporations. First, although "person" is not defined in the NVRA, 1 U.S.C. § 1 provides that "[i]n determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals."

Second, an examination of the legislative history of the NVRA makes clear that Congress intended that organizations be able to sue under the Act. An earlier version of the Act allowed a private cause of action for an aggrieved "individual," but the later version that was passed into law used the term "person." In explaining the change, Senator Ford, a sponsor of the bill, noted that "the modification will permit organizations as well as individuals, and the Attorney General to bring suits under the act." 138 Cong. Rec. S6329 (daily ed. May 7, 1992) (statement of Sen. Ford).[9]

_____

[9] With respect to this aspect of the NVRA's legislative history, the appellees argue that the only right that the Act conveys to a corporation is the right to receive registration forms and that it is this right that the modification of the Act allowed corporations to vindicate. The appellees, however, do not offer any support for their assertion that the change to allow organizations to sue under the NVRA was intended to allow them to enforce only § 1973gg-4(b), which directs the provision of forms to private entities, and no other sections of the Act. Had Congress intended such a limited right of action for an organization, we are convinced that it would have drafted the NVRA's private right of action to make clear its narrow scope when applied to organizations, given its use of terms that more

27

Lastly, our conclusion that Congress intended to eliminate prudential standing requirements for plaintiffs suing under the NVRA is supported by the Act's inclusion of 42 U.S.C. § 1973gg-9(c), a provision that allows the court to award attorneys' fees, litigation expenses, and costs to the prevailing party (other than the United States).  The Court in Bennett viewed such a provision as designed to "encourage enforcement by so-called 'private attorneys general,'" which it emphasized in determining that Congress intended standing under the Endangered Species Act, which provided that "any person may commence a civil suit," to expand to constitutional limits.  520 U.S. at 164 n.2, 165-66; see Trafficante, 409 U.S. at 211 (emphasizing role of private attorneys general in concluding that Congress intended to eliminate prudential standing requirements for plaintiffs suing under Title VIII provision); Conte Bros. Automotive, Inc. v. Quaker State-Slick 50, Inc., 165 F.3d 221, 227 (3d Cir. 1998).

In sum, the NVRA's legislative history, judicial interpretations of the specific language Congress used in the NVRA's private right of action, and the inclusion of a provision for attorneys' fees, which indicates support of enforcement actions by private attorneys general, all suggest that Congress intended the NVRA's private-right-of-action provision to eliminate prudential limitations on standing.  ACORN therefore

_____

strongly connote a restriction to an individual elsewhere in the Act, see, e.g., 42 U.S.C. § 1973gg(b)(1) ("eligible citizens"); id. § 1973gg-3(a) ("applicant"); id. § 1973gg-3(d) ("registrant").

need only satisfy the standing requirements arising under Article III--that it has suffered a redressable injury in fact that is fairly traceable to the appellees' alleged failure to implement the NVRA. See Bennett, 520 U.S. at 162; Hanson v. Veterans Admin., 800 F.2d 1381, 1384-85 (5th Cir. 1986) (stating that plaintiff need only satisfy Article III standing requisites when Congress intended to eliminate prudential standing requirements). As we discussed supra, ACORN has presented a genuine issue of material fact that it has suffered such an injury with respect to its claim that Louisiana has failed to properly implement § 1973gg-5(a)(4)(A); the district court's entry of summary judgment in favor of the appellees on standing grounds with respect to this claim was therefore inappropriate.

## B. Representational Standing

We next analyze whether, even though ACORN lacks standing as an organization to bring its first two claims against the appellees, ACORN has standing to proceed on these claims as a representative of its individual members. Under the test outlined by the Supreme Court in Hunt v. Washington State Apple Advertising Commission, 432 U.S. 333, 343 (1977),

> an association has standing to bring suit on behalf of its members when: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

The appellees focus only on the first prong of the Hunt test; they claim that ACORN has failed to establish a factual issue as

29

to whether any of its members has suffered an injury as a direct result of its alleged failure to implement the NVRA.

ACORN counters with two related arguments. First, ACORN insists that it has identified particular members who are unregistered Louisiana residents, and have therefore been aggrieved by Louisiana's conduct, and second, that each of ACORN's members has been injured as a result of Louisiana's alleged failure to implement the NVRA because of its membership's political interest in voter registration and economic interest in paying minimum membership dues to ACORN. We explain our conclusion that ACORN has failed to raise a factual question as to whether any of its members have suffered an Article III injury below.

## 1. ACORN's eligible, unregistered voters

ACORN's first argument in support of its contention that it has standing to challenge Louisiana's implementation of the NVRA as a representative of its individual members centers on several ACORN members who ACORN claims are eligible to vote, but are not registered to vote in Louisiana. Specifically, in its response to the appellees' interrogatories, ACORN identifies several of its members who it claims "are eligible to register, but who are not registered or [who are] not registered at their current addresses."

The district court properly determined that ACORN failed to raise a factual question as to whether any of its unregistered members had been injured as a direct result of Louisiana's

alleged failure to implement the NVRA. ACORN has provided no evidence that any of its unregistered members had ever received a driver's license renewal form or that any of its unregistered members were previously registered but had been purged from the voter rolls by Louisiana. We therefore fail to see how any unregistered ACORN member has suffered a distinct and palpable injury as a result of the appellees' conduct.

ACORN claims that in Condon v. Reno, 913 F. Supp. 946 (D. S.C. 1995), a federal district court determined that eligible but unregistered voters have standing to bring NVRA implementation suits. ACORN mischaracterizes the district court's holding in Condon, however. In that case, a district court considered whether an individual plaintiff who had moved to South Carolina had suffered an injury sufficient to allow her to bring suit against the state for alleged violations of the NVRA. See id. at 960. The district court determined that the individual plaintiff had suffered an injury based exclusively on the fact that she alleged that South Carolina had failed to make voter registration materials available at the Department of Motor Vehicles office at which she received her driver's license, in direct violation of the NVRA. See id. Thus, Condon stands for the unspectacular proposition that an individual plaintiff who has been directly injured by the actions of a defendant has standing to sue that defendant. See also Krislov v. Rednour, 946 F. Supp. 563, 566 (N.D. Ill. 1996) ("Standing under the NVRA is limited to the United States Attorney General and the 'aggrieved persons' whose

31

voting rights have been denied or impaired."). Unlike in <u>Condon</u>, ACORN has made no such showing of an injury to any of its unregistered members as a direct result of Louisiana's alleged failure to carry out its mail-in driver's license renewal program or to maintain its voter rolls in compliance with the NVRA; it therefore cannot bring suit on behalf of its unregistered voters on these claims.[10]

## 2. ACORN's entire membership

ACORN fares no better on its second argument, which is based on its contention that each of its members has an interest in this litigation sufficient to allow him or her to maintain suit against Louisiana. ACORN alleges that each of its members has suffered three different types of injuries as a result of Louisiana's alleged failure to implement the NVRA. First, ACORN argues that because its members pledge to vote in elections, they have an interest in keeping their voter registration current, and therefore that Louisiana "threatens imminent harm to those

---

[10] ACORN also contends that <u>Condon</u> stands for the proposition that unregistered voters have standing to bring NVRA suits because the district court in that case certified a class, with the individual plaintiff discussed <u>supra</u> as the class representative, of "all eligible but unregistered voters in the State of South Carolina." 913 F. Supp. at 948. However, "the propriety of classwide relief . . . does not require a demonstration that some or all of the unnamed class could themselves satisfy the standing requirements for named plaintiffs." <u>Lewis v. Casey</u>, 518 U.S. 343, 395 (1996) (Souter, J., concurring in part and dissenting in part) (citing 1 H. NEWBERG & A. CONTE, <u>Newberg on Class Actions</u>, § 2.07, at 2-40 to 2-41 (3d ed. 1992) ("Whether or not the named plaintiff who meets individual standing requirements may assert the rights of absent class members is neither a standing issue nor an Article III case or controversy issue but depends on meeting the prerequisites of Rule 23 governing class actions.")).

members who are not currently registered, to those who may be moving, and to those who will be reaching voting age." Second, ACORN argues that because its members pay dues and volunteer their time to ACORN to further the organization's goals, each member has standing to bring suit against the appellees. Third, ACORN argues that it has presented summary judgment evidence that its members who receive services from public aid offices have not been provided voter registration materials, as allegedly required by the NVRA.

We need not consider ACORN's third argument, as we have already determined that ACORN has standing as an organization to challenge the appellees' conduct with respect to the NVRA requirement that Louisiana make voter registration material and assistance available at voter registration agencies, including public aid offices. Like the voter registration activities that conferred standing on ACORN to bring this claim on its own behalf, the fact that some of ACORN's members may have suffered an injury as a result of Louisiana's alleged failure to comply with § 1973gg-5(a)(4)(A) does not provide them with standing to bring related claims for which they have suffered no Article III injury.

In addition, ACORN's claim that its members have suffered injuries because they are "in imminent danger" of losing their current voter registration status is much too speculative and hypothetical to constitute a sufficient Article III injury. In order for a member of ACORN to have standing on this ground,

33

ACORN "must show an individual who has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct, and the injury or threat of injury must be both real and immediate, not conjectural or hypothetical." National Treasury Employees Union v. United States Dep't of Treasury, 25 F.3d 237, 242 (5th Cir. 1994) (internal quotation marks and alterations omitted). ACORN points to no individual member who has ever received a mail-in driver's license application without an accompanying voter registration form or to any member who believes that he or she is in immediate danger of being improperly removed from Louisiana's voter rolls. Its argument on this point is entirely conjectural and therefore fails to present a factual question as to whether any ACORN members has suffered or is in immediate danger of suffering an injury sufficient to confer standing.

Lastly, ACORN's contention that its members have standing because they pay dues and volunteer their time to ACORN to further the organization's goals lacks merit. Analytically, this argument is the same as ACORN's argument that it has standing to sue on its own behalf as a result of resources it has spent combating the appellees' allegedly illegal conduct. The only difference between the two arguments is where ACORN wants this court to focus; supra, we analyzed whether ACORN, as an organization, spent any particularized resources as a direct result of counteracting the appellees' conduct; ACORN now asks us to concentrate our attention on those same resources as they

34

leave ACORN's members hands and are given to ACORN as membership dues. Our conclusion, however, remains the same. ACORN has failed to include any evidence in the record that reasonably supports the inference that any of its members has spent any discrete, particularized, or concrete amount of money or time counteracting Louisiana's alleged failure to include voter registration forms with mail-in driver's license applications or to properly maintain its voter rolls. The district court therefore correctly granted summary judgment to the appellees on the issue of representational standing.[11]

### III. CONCLUSION

For the foregoing reasons, we REVERSE insofar as the district court dismissed ACORN's claim that the appellees violated § 1973gg-5 of the NVRA, and we REMAND with instructions to reinstate that claim. We AFFIRM the district court's judgment in all other respects. Costs shall be borne by ACORN.

AFFIRMED in part and REVERSED in part and REMANDED.

---

[11] ACORN also asserts that it has standing to pursue its claims under 42 U.S.C. § 1983. ACORN's cursory analysis on this issue, in which it fails to provide any legal analysis, operates as a waiver of this issue on appeal. See Kmart Corp. v. Aronds, 123 F.3d 297, 299 n.4 (5th Cir. 1997). Moreover, we note that even if ACORN had preserved this issue, that "[s]ection 1983 . . . is not an available remedy for deprivation of a statutory right when the statute, itself, provides an exclusive remedy for violations of its own terms." Johnston v. Harris County Flood Control Dist., 869 F.2d 1565, 1574 (5th Cir. 1989); see Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 19-20 (1981).